[This decision has been published in *Ohio Official Reports* at 93 Ohio St.3d 253.]

THE STATE OF OHIO, APPELLEE, *v*. COLEY, APPELLANT.

[Cite as *State v. Coley*, 2001-Ohio-1340.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 98-1474—Submitted June 20, 2001—Decided October 3, 2001.)

APPEAL from the Court of Common Pleas of Lucas County, No. CR97-1449.

_____

MOYER, C.J.

{¶ 1} On December 23, 1996, defendant-appellant Douglas Coley, assisted by Joseph Green, kidnapped, robbed, and attempted to murder David Moore in Toledo. Then, on January 3, 1997, Samar El-Okdi was shot between the eyes and left to die in an alley in Toledo. On January 7, 1997, Toledo police stopped a Pontiac sedan that was owned by El-Okdi and being driven by Green. Coley was a passenger. A three-judge panel convicted Green of El-Okdi's murder as well as other offenses.[1] See *State v. Green* (2000), 90 Ohio St.3d 352, 738 N.E.2d 1208.

{¶ 2} In May 1998, a jury convicted Coley of the kidnapping, robbery, and attempted murder of Moore, and the kidnapping, robbery, and aggravated murder of Samar El-Okdi. Coley received a death sentence, and his case is now on direct appeal to this court.

Facts

Offenses Against David Moore

{¶ 3} On December 23, 1996, around 7:30 p.m., David Moore parked his light blue, four-door Ford Taurus at his residence in Toledo. While Moore was unloading his car trunk, a man he later identified as Green asked for directions. As

_____

1. The three-judge panel originally sentenced Green to death. On appeal, this court affirmed the conviction but found irregularities in sentencing. On remand, the three-judge panel reconsidered its opinion and sentenced Green to life in prison without parole. Toledo Blade, April 7, 2001.

he gave directions, another man appeared, whom Moore later identified as Coley. Moore started to leave, but Green and Coley stood in front of him and displayed small-caliber, shiny, semiautomatic pistols. Coley then told Moore, "Give me your keys." Moore complied, and Coley told Moore, "Get in the car." Coley then climbed in behind the wheel, Green got in back behind Moore, and Coley drove the Taurus towards the art museum.

{¶ 4} While in the car, Moore asked them to let him go, but neither Green nor Coley responded. Green did tell Moore to "cough up the cash," and Moore handed Coley $112, which Coley threw on the front seat. Moore noted that Coley was calm and never appeared excited, aggravated, confused, or unsure of himself. After approximately fifteen minutes, Coley pulled into a dark, isolated field and told Moore to get out of the car.

{¶ 5} As Moore backed out of the car, Coley shot him in the stomach. After Moore ran away, he heard a car door open and the car wheels spinning, "trying to get out of the mud." Moore heard somebody chasing him. Other shots were fired, and Moore fell down. Then Moore heard another shot and felt a bullet hit him in the head. He pretended that he was dead, but as his assailant walked away, Moore looked back and thought that Green, who was heavier and taller than Coley, was the one who had just shot him.

{¶ 6} Eventually, Moore struggled to his feet, went to a nearby house, and summoned assistance. Police and a medical team responded and took Moore to a hospital. Moore had been shot in the head, stomach, and arms, and twice in the hand. During one operation, a surgeon removed a .25 caliber bullet from Moore's wrist.

{¶ 7} In addition to the bullet from Moore's wrist, police found two .25 caliber shell casings on Green Street near where Moore had been shot. Evidence established that a gun identified as Coley's gun had ejected the shell casings found on Green Street and fired the bullet removed from Moore's wrist.

{¶ 8} On an evening shortly before Christmas 1996, Tyrone Armstrong, a cousin of both Coley and Green, saw Coley and Green driving a light blue, four-door Ford Taurus. The Taurus, which Armstrong knew did not belong to either of them, was overheating, so Armstrong helped put water in the car. Before his abduction, Moore had purchased but not installed a new replacement radiator because his Taurus tended to overheat.

{¶ 9} That same evening, Armstrong saw Coley and Green with the same .25 caliber semiautomatic pistols that Armstrong had seen each of them previously carry. Armstrong identified State Exhibit 32, a brown-handled pistol with gray duct tape, as the weapon Coley had previously carried, and State Exhibit 33, which had a pearl handle, as Green's pistol. That evening, Green made up a rap song with the words "I shot him five times and he had dropped." At one point, Green pointed his gun at Coley and said, "You better never snitch on me." Coley mimicked the action; pointing his gun at Green, and repeating, "Better never snitch on me." Penne Graves, Coley's girlfriend, also recognized State Exhibit 32 as a gun she had seen around her house.

{¶ 10} After a few days, Coley and Green abandoned Moore's Taurus. On December 27, 1996, police recovered Moore's car in an area near the residence of a girlfriend of Coley. When police found the Taurus, it bore plates that had been stolen from a Mercury Topaz.

Murder of Samar El-Okdi

{¶ 11} Samar El-Okdi was found dead in an alley on January 7, 1997. She had last been seen on January 3, 1997. The police traced El-Okdi's movements on Friday, January 3, 1997, from around 5:00 p.m. until 8:00 p.m., but no evidence firmly established exactly where or when she had been abducted. Sometime after 5:00 p.m. that day, El-Okdi left work and told coworkers that she planned to spend the evening at home. She drove her Pontiac 6000 to her apartment, a block from Moore's residence. Raymond Sunderman, her landlord, saw El-Okdi arrive home

sometime between 5:00 and 5:30 p.m. El-Okdi's brother, Samir El-Okdi, recalls that El-Okdi stopped by late that afternoon at the family-owned convenience store for thirty to forty-five minutes. Around 8:00 p.m., El-Okdi dropped film off at the Blue Ribbon Photo store at Westgate Shopping Center.

{¶ 12} That same Friday, around 8:45 p.m., Rosie Frusher left a friend's house at West Grove Place, near the Toledo Art Museum, to use a pay telephone. As Frusher walked outside the house at which she was staying, she heard two gunshots. After she had passed by the house, she saw a car to her left in an alley. The car had "long taillights" (similar to those on a Pontiac 6000) and a license plate number with a zero (unlike El-Okdi's license number). Frusher saw a black, stocky "man outside the car bending over that had bushy hair." Another man was sitting in the driver's seat. Then Frusher walked to the pay phone and talked to her friend for thirty minutes or so, but she did not return the same way she had come earlier. Ameritech records establish that Frusher made this call at 8:41 p.m.

{¶ 13} On Saturday, January 4, Christopher Neal, El-Okdi's boyfriend, discovered that El-Okdi was missing and notified police. El-Okdi's friends and relatives searched for El-Okdi, hired a private detective, and distributed missing-person flyers. These flyers described El-Okdi, included her photograph, described her car, including the bumper stickers, and listed her last known whereabouts.

{¶ 14} That same weekend in Toledo, Armstrong saw Coley driving a gray Pontiac 6000 that he later identified as El-Okdi's car. On the night his cousins were arrested, Armstrong bought some cigars and two bottles of Alize (an alcoholic beverage) for Green and Coley, which police later found in that Pontiac. Armstrong admitted that Green and Coley had keys and used those keys to drive both the Taurus and the Pontiac.

{¶ 15} Later that night, Monday, January 6, Megan Mattimoe, El-Okdi's friend and coworker, was parked on Scottwood waiting for another friend to distribute the missing-person flyers about El-Okdi. Around 11:15 p.m., Mattimoe

4

saw El-Okdi's car drive by, which she identified by its dented rear fender and a distinctive bumper sticker, although the license plate was different. While following the Pontiac, Mattimoe used a cellphone to call a friend, who in turn called the police. Mattimoe followed the Pontiac until the driver parked at an apartment complex and two men got out.

{¶ 16} After talking with police, Mattimoe and a Toledo detective returned to where the stolen Pontiac was parked. It bore an Ohio license plate, number YRT 022, which had been stolen from another Pontiac 6000 some time before 6:00 p.m. on January 4, 1997. Police staked out the car, using five undercover police vehicles.

{¶ 17} After midnight, Green, Coley, and a woman with a baby got into the Pontiac and drove away. Police followed in undercover vehicles and, assisted by marked police cars, forced the Pontiac to stop. Despite being surrounded, Green rammed one car and spun his wheels in an effort to escape. Green and Coley also resisted arrest, and police forcibly removed each of them from the car. Police found a loaded pistol in Green's coat. When one policeman approached the car, he noticed that Coley, who was sitting in the back seat, had a metallic object in his hand. On the Pontiac's rear floor, police found a loaded, .25 caliber, brown-handled pistol (Exhibit 32) near where Coley had been sitting.

{¶ 18} Inside the trunk, police found a black crochet purse that El-Okdi had with her on January 3 when she disappeared. However, police never found her red wallet and credit cards, which she always carried with her inside the black purse. Police found one of El-Okdi's license plates underneath the stolen rear plate, and they found her other license plate in the car trunk.

{¶ 19} On the afternoon of January 7, police found El-Okdi's body in an alley behind West Grove Place, where Frusher had heard shots and had seen two men in a car four days earlier. El-Okdi was wearing the same white shirt, black shoes, and black trousers that she wore to work on January 3. At the scene, police found a live .25 caliber bullet and a .25 caliber shell casing near El-Okdi's body.

**{¶ 20}** The deputy coroner found that El-Okdi had died from a .25 caliber bullet, which the deputy coroner removed from the back of her cerebellum. The bullet had struck her between the eyes and had been fired from a muzzle distance of approximately twelve to eighteen inches. The deputy coroner concluded that El-Okdi did not die immediately.

**{¶ 21}** David Cogan, a firearms expert, examined the .25 caliber bullet removed from El-Okdi's brain, the .25 caliber bullet removed from Moore's wrist, three .25 caliber shell casings from the two crime scenes, and Coley's .25 caliber semiautomatic pistol recovered from the rear floor of El-Okdi's Pontiac. Cogan concluded that Coley's pistol was in operating condition and had fired the bullets into Moore and El-Okdi and had ejected the three crime-scene shell casings. After police searched Green's residence on January 7, 1997, they found an empty box that had contained .25 caliber Remington ammunition.

**{¶ 22}** On January 7, 1997, Coley and Green were arraigned on charges relating to El-Okdi's stolen Pontiac and the stolen plates. That arraignment was shown on television, and Moore immediately recognized Green and Coley from the television newscast as the men who had kidnapped, robbed, and shot him.

**{¶ 23}** That same week, Coley, Green and their cousin Armstrong were all in jail, although Armstrong was being held on unrelated charges. While Armstrong and Coley were together, Coley hugged him and told him, "I did it but Joe [Green] shouldn't have snitched on me." By this comment, Armstrong understood Coley to mean that Coley had shot El-Okdi. Coley also asked Armstrong to lie for him by claiming that Coley had obtained his weapon and the Pontiac from someone named Denny.

**{¶ 24}** On January 16, 1997, a grand jury heard allegations relating to El-Okdi, and returned an indictment of murder, without death-penalty specifications. Coley was reindicted on March 10, 1997, with the grand jury returning an eight-count indictment for the following offenses: Count I, the kidnapping of David

6

Moore, in violation of R.C. 2905.01(A)(2); Count II, the aggravated robbery of David Moore, in violation of R.C. 2911.01(A)(1); Count III, the attempted murder of David Moore, in violation of R.C. 2923.02; Count IV, the aggravated murder of Samar El-Okdi, in violation of R.C. 2903.01(A); Count V, the aggravated murder of Samar El-Okdi, in violation of R.C. 2903.01(B); Count VI, the aggravated murder of Samar El-Okdi, in violation of R.C. 2903.01(B); Count VII, the kidnapping of Samar El-Okdi, in violation of R.C. 2905.01(A)(2); and Count VIII, the aggravated robbery of Samar El-Okdi, in violation of R.C. 2911.01(A)(1). Each count included a firearm specification in violation of R.C. 2941.145. Count III also had a firearm specification under R.C. 2941.146. Each murder count included a specification under R.C. 2929.04(A)(7) that the murder was committed during a kidnapping or robbery.

{¶ 25} Coley pleaded not guilty to the charges, and was convicted as charged, and the jury found both that Coley was the principal offender in the aggravated murder and that he committed the offense with prior calculation and design. The trial court later merged the three aggravated murder Counts (IV, V, and VI). After a sentencing hearing, the jury recommended, and the trial judge imposed, a death sentence for the aggravated murder of Samar El-Okdi. In addition to the death sentence, the trial court sentenced Coley to ten years on each of Counts I, II, III, VII, and VIII, to be served consecutively, and sentenced him on the firearm specifications.

{¶ 26} We have considered each of the twelve propositions of law. We have also independently reviewed his death sentence, as R.C. 2929.05(A) requires, by reweighing the felony-murder aggravating circumstance against the mitigating factors and measuring the sentence in this case against sentences imposed in similar cases. We conclude that Coley's convictions and death sentence should be affirmed.

I. Pretrial Issues

A.  Change of Venue

{¶ 27} In proposition I, Coley argues that publicity about his case was so pervasive that prejudice must be presumed.  He also argues that the voir dire reinforced his claim that this pervasive publicity prejudiced his right to a fair trial.

{¶ 28} "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."  *Irvin v. Dowd* (1961), 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 755.  However, "pretrial publicity— even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Nebraska Press Assn. v. Stuart* (1976), 427 U.S. 539, 554, 96 S.Ct. 2791, 2800, 49 L.Ed.2d 683, 695.

{¶ 29} Changes in venue help protect fair trial rights.  A trial court may change venue "when it appears that a fair and impartial trial cannot be held" in that court.  Crim.R. 18; R.C. 2901.12(K).  "A change of venue rests largely in the discretion of the trial court * * *."  *State v. Fairbanks* (1972), 32 Ohio St.2d 34, 37, 61 O.O.2d 241, 243, 289 N.E.2d 352, 355.  See, also, *State v. Montgomery* (1991), 61 Ohio St.3d 410, 413, 575 N.E.2d 167, 171.  However, " 'a careful and searching *voir dire* provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality.' "  *State v. Davis* (1996), 76 Ohio St.3d 107, 111, 666 N.E.2d 1099, 1104, quoting *State v. Bayless* (1976), 48 Ohio St.2d 73, 98, 2 O.O.3d 249, 262, 357 N.E.2d 1035, 1051.

{¶ 30} Coley's claims of error based on prejudicial pretrial publicity fail for several reasons.  First, Coley never moved for a change of venue and thus waived his right to complain on this basis.  *State v. Campbell* (2000), 90 Ohio St.3d 320, 336, 738 N.E.2d 1178, 1197; *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus.

{¶ 31} Second, the record contains little direct evidence of media interest, articles, or commentary on the trial.  A defense motion (which did *not* seek a change of venue) included a brief news article and a Toledo Blade editorial dated January

24, 1997. It would be presumed in the absence of evidence to the contrary that any effect from that publicity would have dissipated by the time the case was tried in May 1998. Thus, the record does not support claims of prejudicial pretrial publicity. Moreover, evidence of such publicity cannot be introduced now. See *State v. Ishmail* (1978), 54 Ohio St.2d 402, 8 O.O.3d 405, 377 N.E.2d 500, paragraph one of the syllabus.

{¶ 32} Third, the trial court conducted individual voir dire of prospective jurors as to pretrial publicity. Seven of the seated jurors had never read or heard anything about the case. Two seated jurors had heard only news accounts that a jury was being selected. Three other actual jurors had heard or read about the case, but each promised to decide the case solely on the evidence at trial. Coley never challenged any of these jurors. Moreover, the court excused those prospective jurors who indicated in individual voir dire that they had been affected by pretrial publicity.

{¶ 33} Fourth, the trial court repeatedly cautioned jurors during the trial not to read or listen to media reports. Thus, there was no evidence that publicity about the case compromised the impartiality of any juror.

{¶ 34} Fifth, a decision not to change venue will not be reversed unless it is clearly shown that the trial court has abused its discretion. *State v. Lundgren* (1995), 73 Ohio St.3d 474, 479, 653 N.E.2d 304, 313, citing *State v. Maurer* (1984), 15 Ohio St.3d 239, 250, 15 OBR 379, 388-389, 473 N.E.2d 768, 780. In view of the voir dire, which revealed no prejudice, and the paucity of evidence as to pretrial publicity, Coley has not clearly shown an abuse of discretion. See *State v. White* (1998), 82 Ohio St.3d 16, 21, 693 N.E.2d 772, 777-778; *State v. Bies* (1996), 74 Ohio St.3d 320, 324, 658 N.E.2d 754, 759. Accordingly, we reject Coley's first proposition.

B. Joinder of Offenses

{¶ 35} In proposition XI, Coley argues that the trial court erred by joining for trial, over defense objection, unrelated offenses, namely the December 1996 offenses against Moore and the January 1997 charges relating to the aggravated murder of Samar El-Okdi.

{¶ 36} "The law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.' " *State v. Lott* (1990), 51 Ohio St.3d 160, 163, 555 N.E.2d 293, 298, quoting *State v. Torres* (1981), 66 Ohio St.2d 340, 343, 20 O.O.3d 313, 315, 421 N.E.2d 1288, 1290. Under Crim.R. 8(A), offenses that are based on acts "connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct" may also be joined.

{¶ 37} Nonetheless, "[i]f it appears that a defendant * * * is prejudiced by a joinder" a court may grant a severance under Crim.R. 14. However, the defendant bears the burden to prove prejudice and that the trial court abused its discretion in denying severance. *State v. Torres*, 66 Ohio St.2d 340, 20 O.O.3d 313, 421 N.E.2d 1288, syllabus.

{¶ 38} "A prosecutor can use two methods to negate such claims of prejudice," as noted in *State v. Lott*, 51 Ohio St.3d at 163, 555 N.E.2d at 298. First, if one offense would have been admissible under Evid.R. 404(B), no prejudice could have resulted from joinder. "To be admissible to prove identity through a certain *modus operandi*, other-acts evidence must be related to and share common features with the crime in question." *State v. Lowe* (1994), 69 Ohio St.3d 527, 634 N.E.2d 616, paragraph one of the syllabus. See, also, *State v. Smith* (1990), 49 Ohio St.3d 137, 551 N.E.2d 190.

{¶ 39} Here, the Moore offenses were admissible under Evid.R. 404(B) to prove Coley's identity as El-Okdi's killer. The similarities between the offenses were remarkable. The carjack victims, El-Okdi and Moore, lived within a block of each other, and both were abducted within two weeks of each other at roughly the

same time of day, between 7:30 and 8:15 p.m. Both victims were driven to a nearby secluded area, robbed of money, shot using the same gun, and then left to die alone. Green and Coley drove each car for several days after placing plates stolen from a similar car on the stolen car.

{¶ 40} The court has upheld the use of similar other-acts evidence in comparable cases. See, *e.g.*, *State v. Green* (2000), 90 Ohio St.3d 352, 369, 738 N.E.2d 1208, 1228 (same facts, Coley's accomplice Joseph Green); *State v. Bey* (1999), 85 Ohio St.3d 487, 490, 709 N.E.2d 484, 491 (businessmen stabbed in chest with knife, and shoes and trousers removed); *State v. Woodard* (1993), 68 Ohio St.3d 70, 73, 623 N.E.2d 75, 77-78 (carjacking attempt to prove identity as to later carjacking and murder); *State v. Jamison* (1990), 49 Ohio St.3d 182, 183-187, 552 N.E.2d 180, 182-185 (similar strong-arm robberies of stores). See, also, *State v. Watson* (1971), 28 Ohio St.2d 15, 19-22, 57 O.O.2d 95, 97-98, 275 N.E.2d 153, 156-157 (proof of other criminal acts allowed to prove possession of murder weapon); *State v. Martin* (1985), 19 Ohio St.3d 122, 127, 19 OBR 330, 334, 483 N.E.2d 1157, 1162 (proof of theft of victim's weapon allowed to prove possession of murder weapon).

{¶ 41} Furthermore, the state can separately negate prejudice by showing that "evidence of each crime joined at trial is simple and direct. * * * Thus, when simple and direct evidence exists, an accused is not prejudiced by joinder regardless of" whether the evidence is admissible as other-acts evidence. *Lott*, 51 Ohio St.3d at 163, 555 N.E.2d at 298. See, *e.g.*, *State v. Johnson* (2000), 88 Ohio St.3d 95, 109-110, 723 N.E.2d 1054, 1068 (assaults against female neighbors); *State v. Franklin* (1991), 62 Ohio St.3d 118, 123, 580 N.E.2d 1, 6 (burglaries in same neighborhood). In Coley's case, the proof of each offense was separate and distinct. The jury was not likely to be confused as to which evidence proved that Coley had attempted to murder Moore and which proved that he had murdered El-Okdi.

**{¶ 42}** Here, the state satisfied both tests, either of which was sufficient to negate Coley's claims of prejudice. "Simple and direct" evidence was involved, and the evidence was admissible in any event as other-acts evidence. In comparable circumstances the court has approved joinder of offenses. In *State v. Williams* (1995), 73 Ohio St.3d 153, 158, 652 N.E.2d 721, 727, the court allowed a single trial of different robberies when the same gun was apparently used to kill a cab driver and assault a truck driver. In *State v. Mills* (1992), 62 Ohio St.3d 357, 362, 582 N.E.2d 972, 979, the court approved joinder for separate robberies, three months apart, against different bank branches. See, also, *State v. Lott*, 51 Ohio St.3d at 163, 555 N.E.2d at 298.

**{¶ 43}** Finally, the trial court provided a limiting instruction to the jury during the guilt phase on the limited use of the Moore evidence to prove Coley's identity as El-Okdi's killer. The trial court also instructed the jury in the penalty phase regarding the specific aggravating circumstances that the jury was to consider in imposing punishment for El-Okdi's aggravated murder. Cf. *State v. Waddy* (1992), 63 Ohio St.3d 424, 428, 588 N.E.2d 819, 824. Moreover, Coley never objected to the instructions, nor did he claim that the jury was confused about the relevance of the Moore offenses. Accordingly, we find no merit to Coley's eleventh proposition of law and overrule it.

C.  Disclosure of Grand Jury Minutes

**{¶ 44}** In proposition XII, Coley argues that the trial court erred in not disclosing grand jury minutes because Coley demonstrated a particularized need for records of those proceedings.  We disagree.

**{¶ 45}** Coley recognizes that "[g]rand jury proceedings are secret, and an accused is not entitled to inspect grand jury transcripts either before or during trial unless the ends of justice require it and there is a showing by the defense that a particularized need for disclosure exists which outweighs the need for secrecy." *State v. Greer* (1981), 66 Ohio St.2d 139, 20 O.O.3d 157, 420 N.E.2d 982, paragraph two of the syllabus.  Also, "[w]hether particularized need for disclosure of grand jury testimony is shown is a question of fact * * *." *Id*., paragraph three of the syllabus.  Moreover, whether to release grand jury testimony "is within the discretion of the trial court." *Id*., paragraph one of the syllabus.  A decision to deny release will not be reversed absent an abuse of discretion.  *State v. Brown* (1988), 38 Ohio St.3d 305, 308, 528 N.E.2d 523, 530.

**{¶ 46}** Coley argues that he demonstrated a particularized need because the grand jury indicted Coley for the Moore and El-Okdi offenses in a noncapital indictment issued in January 1997.  In March 1997, the prosecutor resubmitted the case, and another grand jury issued a capital indictment against Coley.  Coley was then tried on those new charges.

**{¶ 47}** However, the trial court rejected Coley's argument that a capital indictment had improperly replaced the earlier noncapital indictment.  At the trial court hearing on the issue, Coley agreed that the fact that he had been reindicted did not show a particularized need.  Further, Coley agreed that he did not claim that prosecutorial vindictiveness was involved.

**{¶ 48}** At the hearing Coley showed that some police officers were unhappy that the first indictment was for noncapital offenses and expressed their thoughts to a newspaper reporter.  Thereafter, a Toledo Blade editorial questioned why Coley

and Green had not been indicted on capital offenses. Police investigated further and secured additional evidence, which was presented to a second grand jury. A second indictment is not an uncommon procedure, as evidence frequently comes to light after an initial indictment.

**{¶ 49}** This new evidence presented to a second grand jury demonstrated that El-Okdi had been kidnapped and robbed. Three witnesses who had not testified before the first grand jury testified before the second grand jury. Among the three was Frusher, who had heard shots and had seen El-Okdi's car, along with two suspects, near West Grove Place at about 8:35 p.m. on January 3. At that location, police found El-Okdi's body on January 7. Also, new evidence showed that El-Okdi's purse was missing.

**{¶ 50}** Thus, Coley failed to show a particularized need for the grand jury testimony. The subsequent capital indictment was based on additional investigation and new evidence, not on improper motives such as placating a newspaper or police department.

**{¶ 51}** In previous cases, this court has rejected similar generalized claims attempting to violate the sanctity of grand jury secrecy. For example, in *State v. Benge* (1996), 75 Ohio St.3d 136, 145, 661 N.E.2d 1019, 1028, Benge argued that something improper occurred in the grand jury because "he was bound over on charges of murder and theft but indicted" on capital charges. The *Benge* court ruled, however, that his indictment "on elevated charges" did not show any particularized need and thus rejected arguments similar to those that Coley makes.

**{¶ 52}** In *State v. Brown*, 38 Ohio St.3d at 308, 528 N.E.2d at 530, the court held that a trial court did not abuse its discretion when it found no particularized need based on defense claims that the indictment was issued on insufficient evidence. See, also, *State v. Mack* (1995), 73 Ohio St.3d 502, 508, 653 N.E.2d 329, 334 (claims that a witness "fabricated his story to conceal his own involvement" were not sufficient); *State v. Davis* (1988), 38 Ohio St.3d 361, 365, 528 N.E.2d

925, 929-930 (claims that indictment was based on "illegal and incompetent evidence" did not establish particularized need). See, also, *State v. Stojetz* (1999), 84 Ohio St.3d 452, 459-460, 705 N.E.2d 329, 337-338; *State v. Webb* (1994), 70 Ohio St.3d 325, 336-337, 638 N.E.2d 1023, 1034.

{¶ 53} Finally, a presumption of regularity supports prosecutorial decisions such as the decision in this case to present additional evidence to another grand jury. See *United States v. Armstrong* (1996), 517 U.S. 456, 464, 116 S.Ct. 1480, 1486, 134 L.Ed.2d 687, 698; *Bordenkircher v. Hayes* (1978), 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604, 611. In sum, Coley has not demonstrated that the trial court abused its discretion in refusing to release a record of grand jury proceedings. Accordingly, we overrule Coley's twelfth proposition.

## II. Guilt-Phase Issues

### A. Sufficiency of Evidence

{¶ 54} In proposition II, Coley challenges the sufficiency of the evidence to support the jury's finding of prior calculation and design and argues that the finding of guilt as to Count IV must be set aside.

{¶ 55} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

{¶ 56} As to "prior calculation and design," no "bright-line test" exists that "emphatically distinguishes between the presence or absence" of "prior calculation and design." *State v. Taylor* (1997), 78 Ohio St.3d 15, 20, 676 N.E.2d 82, 89. Yet

" 'prior calculation and design' is a more stringent element than the 'deliberate and premeditated malice' * * * required under prior law." *State v. Cotton* (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, paragraph one of the syllabus. "Instantaneous deliberation is not sufficient * * *." *Id*., paragraph two of the syllabus. " '[P]rior calculation and design' requires 'a scheme designed to implement the calculated decision to kill.' " *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 196, 616 N.E.2d 909, 918, quoting *State v. Cotton*, 56 Ohio St.2d at 11, 10 O.O.3d at 6, 381 N.E.2d at 193.

{¶ 57} In this case, the facts are sufficient to show that Coley "adopted a plan to kill." See *State v. Toth* (1977), 52 Ohio St.2d 206, 213, 6 O.O.3d 461, 465, 371 N.E.2d 831, 836. Green and Coley probably kidnapped El-Okdi from the street in front of her home, one block from where Moore was also kidnapped. El-Okdi planned to spend the evening at home alone. She had no reason to be at the secluded location where her body was later found. From whatever location Coley and Green abducted El-Okdi, they drove her to a dead-end alley. They had no reason to drive her to this out-of-the-way spot except to kill her, a fact that shows prior calculation and design. Cf. *State v. Ballew* (1996), 76 Ohio St.3d 244, 250, 667 N.E.2d 369, 377 (victim abducted and taken to remote location).

{¶ 58} The evidence supports the jury's finding that when Coley and Green arrived at this dead-end alley, Coley personally shot El-Okdi between the eyes, execution style, and thus was the principal offender. Coley's gun was the murder weapon. No evidence suggests that El-Okdi, a small woman, resisted or that she posed a threat to Coley or Green, who were armed. After Coley shot her, Coley and Green used El-Okdi's car for several days, knowing that she could not report it as stolen, which is further evidence of a plan to kill. Finally, just twelve days earlier, Coley, assisted by Green, had kidnapped and robbed David Moore, drove him to a similar deserted area, shot him several times, and left him to die.

{¶ 59} Moreover, prior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes. See, *e.g.*, *State v. Palmer* (1997), 80 Ohio St.3d 543, 567-568, 687 N.E.2d 685, 706 (road-rage double homicide that quickly occurred after traffic accident); *State v. Taylor*, 78 Ohio St.3d at 20-23, 676 N.E.2d at 89-91 (chance encounter in bar between rivals for another's affections).

{¶ 60} In any event, the death penalty in this case does not hinge on a finding of prior calculation and design. The jury found Coley guilty of two counts of aggravated murder based on felony-murder, and the jury also found that Coley was the principal offender in the murder. The alternative of felony-murder with prior calculation and design was not put before the jury in the penalty phase. Therefore, we reject Coley's second proposition.

B.  Double Jeopardy

{¶ 61} In proposition IV, Coley argues that his rights against double jeopardy and due process were violated. Coley argues that he "was punished three times for aggravated murder," was "punished again for kidnapping and aggravated robbery," and "was thus punished various times for one indivisible act."

{¶ 62} Coley misreads the record. The trial court merged the three murder charges against Coley into a single offense. The trial jury verdict referred to one death penalty, and the trial court imposed only a single death penalty.

{¶ 63} Also, the constitutional protection against double jeopardy does not preclude a defendant from being separately punished for an aggravated murder and for felonies involved in that murder. In order to commit murder, neither aggravated robbery nor kidnapping need be committed. This court has repeatedly rejected similar double-jeopardy claims and held that aggravated murder is not an allied offense of similar import to an underlying aggravated robbery. *State v. Reynolds* (1998), 80 Ohio St.3d 670, 681, 687 N.E.2d 1358, 1371; *State v. Smith* (1997), 80

Ohio St.3d 89, 117, 684 N.E.2d 668, 694. See, also, *State v. Bickerstaff* (1984), 10 Ohio St.3d 62, 10 OBR 352, 461 N.E.2d 892, syllabus.

{¶ 64} As to kidnapping, this court has also found that "aggravated murder and kidnapping are not allied offenses of similar import under R.C. 2941.25." *State v. Keenan* (1998), 81 Ohio St.3d 133, 154, 689 N.E.2d 929, 948. See, also, *State v. Reynolds*, 80 Ohio St.3d at 682, 687 N.E.2d at 1371; *State v. Jells* (1990), 53 Ohio St.3d 22, 32, 559 N.E.2d 464, 474; *State v. Powell* (1990), 49 Ohio St.3d 255, 261-262, 552 N.E.2d 191, 198-199.

{¶ 65} The aggravated robbery and the kidnapping were also separate offenses under the facts. Coley and Green abducted El-Okdi and drove with her to a secluded location. Such prolonged restraint and substantial movement of the victim demonstrates a "separate animus" sufficient to permit punishment of the kidnapping in addition to the robbery. *State v. Logan* (1979), 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345, syllabus. Neither offense was merely incidental to the other offense. Cf. *State v. Reynolds*, 80 Ohio St.3d at 682, 687 N.E.2d 1358; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 198, 15 OBR 311, 340, 473 N.E.2d 264, 295. Accordingly, we reject Coley's fourth proposition.

C. Gruesome Photographs

{¶ 66} In proposition V, Coley argues that the trial court erred in admitting gruesome photographs of the victim that had "little probative value" and were "highly prejudicial." However, Coley fails to specify which photographs were objectionable or exactly why they were inadmissible. The trial court admitted, without objection, five crime-scene photos of El-Okdi's body and one autopsy photo.

{¶ 67} Since the defense counsel did not object to these photographs at trial, he thereby waived all but plain error. *State v. Taylor*, 78 Ohio St.3d at 26, 676 N.E.2d at 93; *State v. Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364. No outcome-determinative plain error resulted from admitting these exhibits in

18

view of the other compelling evidence of guilt, including the forensic evidence showing that Coley's gun was the murder weapon.

{¶ 68} Moreover, no error occurred. In capital cases, nonrepetitive photographs, even if gruesome, are admissible if relevant and of probative value, as long as the probative value of each photograph outweighs the danger of material prejudice to an accused. *State v. Maurer*, 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus; *State v. Morales* (1987), 32 Ohio St.3d 252, 257, 513 N.E.2d 267, 273. Decisions on the admissibility of photographs are "left to the sound discretion of the trial court." *State v. Slagle* (1992), 65 Ohio St.3d 597, 601, 605 N.E.2d 916, 923; *State v. Maurer*, 15 Ohio St.3d at 264, 15 OBR at 401, 473 N.E.2d at 791.

{¶ 69} The five crime-scene photographs portray El-Okdi's body in relation to her surroundings and from different angles and distances. Although arguably gruesome, Exhibits 50 and 65 simply show El-Okdi's clothed body in a partly curled position, and she appears as though she were asleep, aside from traces of blood. The photographer took Exhibits 63 and 64 from a much greater distance, and one cannot even clearly discern that a body is shown in those photos. Exhibits 66 (crime scene) and 72 (coroner), which are gruesome, portray El-Okdi's face and clearly show the gunshot wound both before (Exhibit 66) and after (Exhibit 72) the wound was cleaned.

{¶ 70} These photos illustrated the testimony of detectives and the deputy coroner who saw the crime scene, portrayed El-Okdi's body in relation to her surroundings, and Exhibits 66 and 72, portraying the wound, helped to prove the killer's intent and the lack of accident or mistake. See *State v. Goodwin* (1999), 84 Ohio St.3d 331, 342, 703 N.E.2d 1251, 1261; *State v. Mason* (1998), 82 Ohio St.3d 144, 158-159, 694 N.E.2d 932, 949. These photos also gave the jury an "appreciation of the nature and circumstances of the crimes." *State v. Evans* (1992), 63 Ohio St.3d 231, 251, 586 N.E.2d 1042, 1058. The photos were limited in

number, had substantial probative value and relevance, and, while some were gruesome, none were particularly inflammatory. In other cases involving even more gruesome photographs, the court has found no abuse of discretion. See, *e.g.*, *State v. Smith*, 80 Ohio St.3d at 108, 684 N.E.2d at 687; *State v. Biros* (1997), 78 Ohio St.3d 426, 444, 678 N.E.2d 891, 907; *State v. Joseph* (1995), 73 Ohio St.3d 450, 460, 653 N.E.2d 285, 294.

{¶ 71} Finally, in addition to not objecting at the trial, Coley never objected to the photos that were introduced at the penalty phase. No outcome-determinative plain error resulted from any penalty-phase carryover effect from these photos due to the insufficiency of mitigating evidence. Thus, we reject Coley's fifth proposition.

### D. Guilt-phase Instructions

{¶ 72} In propositions III, VI, VII, and IX, Coley argues that the trial court's guilt-phase jury instructions contained various deficiencies. Coley, however, failed to object at trial or request specific instructions and thus waived all but plain error. Crim.R. 30(A); *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus; *State v. Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, syllabus. No alleged deficiency caused a different trial result or created a manifest miscarriage of justice. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804. Thus, these propositions could be rejected on the basis alone that no plain error was involved.

{¶ 73} Moreover, Coley's challenges to the court's jury instructions lack merit. In discussing proposition III, Coley argues that "the trial court defined prior calculation as the offender's purpose to cause death." However, the court's instructions did not equate purpose with prior calculation and design, nor did the instructions confuse these separate elements. For example, the court stated:

"Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result or engaging in specific conduct. To do an act

purposefully is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct."

{¶ 74} In contrast, the court explained and defined prior calculation and design differently. The court instructed:

"Prior calculation and design means that the purpose to cause the death was reached by *a definite process of reasoning in advance* of the homicide, which process of reasoning must have included *a mental plan involving studied consideration of the method and the means* and/or instrument with which to cause the death of another.

"To constitute prior calculation, there must have been sufficient time and opportunity for the *planning of an act of homicide* and the circumstances surrounding the homicide must show *a scheme designed to carry out the calculated decision* to cause the death. No definite period of time must lapse * * *, but acting on the *spur of the moment* or after momentary consideration of the purpose to cause the death is not sufficient." (Emphasis added.)

{¶ 75} The trial court used separate terms to explain prior calculation and design, such as "a definite process of reasoning in advance," a "mental plan involving studied consideration of the method and the means," "planning of an act of homicide," and a "scheme designed to carry out the calculated decision." The court also noted that acting on the "spur of the moment" was not sufficient.

{¶ 76} These instructions, consistent with Ohio Jury Instructions, did not confuse these separate elements. See 4 Ohio Jury Instructions (1997 and Supp. 2000), Section 503.01. Nor did these instructions serve to direct a verdict on prior calculation and design as Coley claims. Coley's claim that the trial court confused purpose or intent with prior calculation and design lacks merit. Moreover, this court has previously rejected such claims. See *State v. Jones* (2001), 91 Ohio St.3d 335,

348, 744 N.E.2d 1163, 1178; *State v. Campbell* (2000), 90 Ohio St.3d 320, 341, 738 N.E.2d 1178, 1200-1201.  Accordingly, we reject Coley's third proposition.

{¶ 77} In proposition VI, Coley argues that the trial court's jury instructions shifted "the burden of proof from the state by instructing the jury to deliberate on the innocence of the accused."  Coley's claim of error rests on the following guilt-phase instruction:  "You may not discuss or consider the subject of punishment.  Your duty is confined to the *determination of the guilt or innocence* of the Defendant * * *."  (Emphasis added.)

{¶ 78} Coley's claim of plain error from the above instruction lacks merit.  At most, the use of the phrase "guilt or innocence" in this limited context relating to punishment is totally inconsequential.  "A single instruction to a jury may not be judged in artificial isolation but must be viewed in the context of the overall charge."  *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus, following *Cupp v. Naughten* (1973),  414 U.S. 141, 146-147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368, 373.

{¶ 79} The trial court had already repeatedly instructed the jury that the state had the burden of proof as to each element of each offense and that if the state failed to meet that burden the jury must acquit.  Even considering this evidence standing alone, no juror would have believed that this incidental reference to "guilt or innocence" in this context shifted the state's burden of proof to the accused.

{¶ 80} Moreover, this court has previously rejected complaints of prejudicial error arising from the use of the term "guilt or innocence" in this limited context.  See *State v. Jones*, 91 Ohio St.3d 335, 348-349, 744 N.E.2d 1163, 1179; *State v. Campbell*, 90 Ohio St.3d at 341, 738 N.E.2d at 1200.  We therefore reject Coley's sixth proposition.

{¶ 81} In proposition VII, Coley suggests that the trial court created an "unconstitutional, conclusive presumption of the *mens rea* element from the use of a deadly weapon."  Coley argues that the court erred by not instructing that "any

inference of intent to kill from the manner and commission of the offense is nonconclusive." Coley points to R.C. 2903.01(E), which then stated:

"If a jury in an aggravated murder case is instructed that a person who commits or attempts to commit [a felony-murder] may be inferred, * * * because the offense and the manner of its commission would be likely to produce death * * *, to have intended to cause the death of any person who is killed * * * during the commission of * * * the offense, the jury *shall also be instructed that the inference is nonconclusive*, that the inference may be considered in determining intent, that it is to consider all evidence * * * in determining whether the person specifically intended to cause the death of the person killed * * *, and that the prosecution must prove the specific intent of the person to have caused the death * * * by proof beyond a reasonable doubt." (Emphasis added.) 147 Ohio Laws, 6237.

{¶ 82} In fact, the trial court did instruct the jury that the inference was not conclusive:

"If a wound is inflicted upon a person with a deadly weapon in a manner calculated to * * * destroy life or inflict great bodily harm, the purpose to cause the death *may be inferred* from the use of the weapon. However, the *use of a deadly weapon is not conclusive evidence of a purpose* to cause the death of another. *Whether or not you draw the inference* of purpose to kill from the use of the deadly weapon *is entirely up to you*." (Emphasis added.)

{¶ 83} The trial court's instruction fully satisfied the statutory requirement that the jury be told that any "inference is *nonconclusive*." The court said "inferred," not "presumed," and the word "may" is permissive, not mandatory. Further, the court specifically instructed the jury that "use of a deadly weapon *is not conclusive evidence* of a purpose to cause" death and "[w]hether or not you draw the inference of purpose to kill from the use of the deadly weapon is entirely up to you." Also, the court repeatedly advised the jury that Coley "may not be

convicted of aggravated murder unless" the jury found "beyond a reasonable doubt [that] Douglas Coley specifically intended to cause the death of Samar El-Okdi."

{¶ 84} Finally, this court has repeatedly rejected arguments similar to those Coley makes. See, *e.g.*, *State v. Campbell*, 90 Ohio St.3d at 342, 738 N.E.2d at 1200; *State v. Stallings* (2000), 89 Ohio St.3d 280, 291, 731 N.E.2d 159, 172; *State v. Getsy* (1998), 84 Ohio St.3d 180, 196, 702 N.E.2d 866, 883. See, also, *State v. Coleman* (1988), 37 Ohio St.3d 286, 290, 525 N.E.2d 792, 797. We therefore reject Coley's seventh proposition.

{¶ 85} In proposition IX, Coley challenges the court's guilt-phase reasonable doubt instruction, which incorporated the statutory definition contained in R.C. 2901.05. It is our practice to rule summarily on well-settled points of law. Thus we summarily overrule Coley's ninth proposition of law on authority of *State v. Jones* (2000), 90 Ohio St.3d 403, 417, 739 N.E.2d 300, 316; *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 594 N.E.2d 604; *State v. Nabozny* (1978), 54 Ohio St.2d 195, 8 O.O.3d 181, 375 N.E.2d 784, paragraph two of the syllabus.

### III. Penalty Instructions

{¶ 86} In proposition VIII, Coley argues that his constitutional rights were violated "when the legal issue of relevance is left to the jury regarding sentencing considerations." Coley argues that "the jury's discretion was improperly guided" because the jury was not told exactly "what trial evidence was relevant to the weighing process." Thus, Coley argues that the trial court erred by instructing the jury:

"For purposes of this proceeding, only that testimony and evidence which was presented in this [first] phase that is relevant to the two aggravating circumstances * * * and to any of the mitigating factors * * * are to be considered by you."

{¶ 87} However, Coley did not object to this instruction or request another instruction. Thus, Coley waived all but plain error. *State v. Underwood* (1983), 3

Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. Neither plain error nor any other error was involved.

{¶ 88} Contrary to Coley's complaint, the trial court focused the jury's attention in the sentencing phase. First, the court admitted only eleven exhibits from the guilt phase into the penalty phase. Cf. *State v. Lindsey* (2000), 87 Ohio St.3d 479, 484-485, 721 N.E.2d 995, 1003 (trial court has "duty to determine the evidence relevant for consideration"). The trial court admitted photos of El-Okdi without objection, but those were arguably relevant to the penalty phase. See *State v. Gumm* (1995), 73 Ohio St.3d 413, 653 N.E.2d 253, syllabus; *State v. DePew* (1988), 38 Ohio St.3d 275, 528 N.E.2d 542, paragraph one of the syllabus; *State v. Woodard*, 68 Ohio St.3d at 78, 623 N.E.2d at 81. The trial court also admitted photos of the gun that killed El-Okdi; however, if this was in error, it was certainly harmless.

{¶ 89} Second, in the penalty phase the trial court instructed the jury that some "evidence and testimony" considered earlier at the guilt phase was "no longer relevant" for purposes of sentencing. The court instructed the jury to consider only "evidence * * * presented in [the guilt] phase that is relevant to the two aggravating circumstances" proved earlier or to mitigating factors raised by Coley.

{¶ 90} Third, the trial court carefully instructed the jury regarding the aggravating circumstances. The court also instructed that "the aggravated murder itself is not an aggravating circumstance. * * * Rather, the aggravating circumstances * * * are all that you will consider on the aggravation side of the scale."

{¶ 91} Fourth, the significance to be given the evidence or exhibits was a matter for the jury. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. Viewing

the penalty instructions as a whole, we therefore find that the trial court adequately guided the jury as to the evidence to consider in the penalty phase.

{¶ 92} Finally, this court has previously rejected similar complaints of prejudicial error relating to penalty-phase instructions as to "what trial evidence was relevant to the weighing process." See *State v. Jones*, 91 Ohio St.3d at 349-350, 744 N.E.2d at 1179-1180.

IV. Settled Constitutional Issues

{¶ 93} In proposition X, Coley challenges the constitutionality of Ohio's death penalty statute, but that claim can be summarily rejected. *State v. Carter* (2000), 89 Ohio St.3d 593, 608, 734 N.E.2d 345, 358; *State v. Clemons* (1998), 82 Ohio St.3d 438, 454, 696 N.E.2d 1009, 1023; *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus. Coley's challenge based on international law can also be summarily rejected. *State v. Bey*, 85 Ohio St.3d at 502, 709 N.E.2d at 499; *State v. Phillips* (1995), 74 Ohio St.3d 72, 103-104, 656 N.E.2d 643, 671. This international law challenge was also waived, since Coley never raised international issues before the trial court. *State v. Awan* (1986), 22 Ohio St.3d 120, 22 OBR 199, 489 N.E.2d 277, syllabus; *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus.

V. Independent Sentence Evaluation

{¶ 94} In addition to ruling on Coley's propositions of law, R.C. 2929.05(A) requires us to review Coley's death sentence independently. We must determine whether the evidence supports the jury's finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether the death sentence is proportionate to those we have affirmed in similar cases. *Id.*

A. Penalty-Phase Evidence

{¶ 95} Several of Coley's relatives testified for the defense, including Karen Armstrong, the sister of Coley's mother; Douglas Bell, Coley's father; and

Willie Austin and Martha Davis, Bell's sisters and Coley's aunts. Additionally, Dr. Wayne Graves, a clinical psychologist, testified concerning Coley's mother, Victoria Coley. The testimony of these witnesses and the extensive documentary evidence confirming their testimony establishes that Coley's upbringing can be described as a chaotic nightmare.

**{¶ 96}** Victoria Coley, Coley's mother, was one of nine sisters. Victoria Coley was hospitalized in state mental hospitals some fifteen times between 1977 (when Coley was two years old) to 1991. Victoria also had extensive outpatient treatment when she was not institutionalized. Victoria, who had an IQ in the 65-68 range, was a chronic paranoid schizophrenic. She also suffered from mixed substance abuse and borderline personality disorders. When out of institutions, Victoria used street drugs, drank heavily, and engaged in prostitution to obtain money for drugs. In 1989, Victoria was found not guilty by reason of insanity for the aggravated arson of her home that endangered her children.

**{¶ 97}** Her sister-in-law, Martha Jean Davis, described Victoria as an "oversexed mental patient * * * [who] wouldn't keep her clothes on." She "would strip and run down * * * the street with no clothes on. * * * [S]he would have sex with anyone, anybody, anywhere * * *." Victoria had sex with Davis's ten-year-old son, and reportedly had sex with her own children. When Victoria was institutionalized, her children stayed with relatives. However, Coley and his older brother, Victor, were neglected and malnourished, whether they were with Victoria or relatives. In referring to both Victoria's family and Bell's family, Davis characterized them as "all alcoholics and drug addicts." Children's Service Bureau and other social service records concerning Victoria and her family date from 1975 and document the family's horrific problems and neglect of the children, including Coley.

**{¶ 98}** Douglas Bell, Coley's father, was not a positive father figure. Bell went to prison for five years when Coley was just a few months old. Bell lived

with Victoria at various times, but Bell agreed that he has served about six or seven prison terms and had been convicted of burglary, robbery, felonious assault, drug trafficking, and other offenses. After Coley was born, Bell was usually in prison or involved with drugs.

{¶ 99} Karen Armstrong, Coley's aunt, testified that Victoria's life went downhill after she became involved with Bell and his family because she used drugs more frequently and engaged in prostitution.

{¶ 100} Willie Louise Austin, Bell's sister, stated that her entire family of six brothers and four sisters was not stable. Austin testified that she had been a prostitute and drug addict and that everyone in the family had been drug addicts or alcoholics at some point. The children (Coley and Victor) were forced to fend for themselves, which is "where the panhandling and stealing and selling dope comes in."

{¶ 101} Marquita Armstrong, Victoria's sister, testified for the state and identified a letter Coley had written to her acknowledging that he had been taught the difference between right and wrong. Coley stayed with Marquita at times in his childhood and attended church when he did. Marquita admitted that her boyfriend sold drugs when Coley lived with her. She also agreed that she had shot her boyfriend but "[n]ot for selling drugs."

{¶ 102} Douglas Coley did not testify or make an unsworn statement to the jury. Although the defense presented evidence about Coley's parents and relatives, the defense presented little or no direct evidence as to Coley's character, schooling, or employment history. Coley was born on August 24, 1975, and was twenty-one years old at the time of these offenses.

{¶ 103} Although Coley did not speak to the jury, he made an unsworn statement at the sentencing hearing. Coley told the trial court that because of his upbringing and life, "[s]ometimes there's no way to control how you get caught up in things * * *." Coley also sent his "condolences to the El-Okdi family for what

happened to their daughter * * * your sister, your friend—but I'm not that monster that was in that alley that night. * * * I ain't that monster * * *."

B. Sentence Evaluation

{¶ 104} After independent assessment, we find that the evidence is sufficient to prove the aggravating circumstances, *i.e.*, that Coley committed aggravated murder, as the principal offender, in the course of committing kidnapping and aggravated robbery.

{¶ 105} The nature and circumstances of the offense reveal nothing of mitigating value. Coley, assisted by Green, kidnapped and robbed El-Okdi, an innocent young woman, and then drove with her in her own car to a deserted area, where Coley shot her between the eyes. Then Coley and Green left her to die, alone and uncared for, on a January night.

{¶ 106} Upon a review of the evidence presented in mitigation, we find that Coley's background is entitled to some weight in mitigation. The defense presented strong, credible evidence that Coley's history and background involved a chaotic, nightmarish upbringing by a mother with very serious mental problems and a father who was in prison most of the time. Moreover, the extended family of Victoria and Bell, who cared for Coley and his brother when his mother and father were institutionalized, offered no better care. Coley's history and background are worthy of mitigating value because he faced overwhelming obstacles throughout his childhood and youth. No evidence was presented as to Coley's character.

{¶ 107} Coley's age of twenty-one at the time of the offenses is a mitigating factor under R.C. 2929.04(B)(4). No evidence in the record supports other statutory mitigating factors.

{¶ 108} Once again, as we have been in a number of death penalty cases, we are presented with a record that contains evidence of unrelenting, shocking abuse of a child by adults, including a parent. However, after weighing the aggravating circumstances against the mitigating evidence, we find that the

aggravating circumstances of murder in the course of robbery and kidnapping outweigh the mitigation evidence of Coley's young age and deprived childhood.

**{¶ 109}** The death penalty imposed against Coley is also appropriate and proportionate when compared with other aggravated murders involving either kidnapping or aggravated robbery. See, *e.g.*, *State v. Moore* (1998), 81 Ohio St.3d 22, 44, 689 N.E.2d 1, 20; *State v. Henness* (1997), 79 Ohio St.3d 53, 69, 679 N.E.2d 686, 700; *State v. Cook* (1992), 65 Ohio St.3d 516, 531, 605 N.E.2d 70, 85; and *State v. Roe* (1989), 41 Ohio St.3d 18, 28-29, 535 N.E.2d 1351, 1363.

C.  Conclusion

**{¶ 110}** For the foregoing reasons, we affirm the convictions.  Finding the death penalty appropriate and proportionate, we affirm the sentence of death. The judgment of the court of common pleas is hereby affirmed.

*Judgment affirmed.*

DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

————————————

*Julia R. Bates,* Lucas County Prosecuting Attorney*, Dean P. Mandross*, *Eric A. Baum* and *Gary G. Cook,* Assistant Prosecuting Attorneys, for appellee.

*Joseph A. Benavidez*, for appellant.

————————————