OPINION
On June 22, 2000, David G. Fox was indicted on a charge of aggravated murder with a gun specification. He was accused of purposely causing the death of Montel Young and acting with prior calculation and design.
Mr. Fox pled not guilty at his arraignment and counsel was appointed to represent him. Later, retained counsel entered an appearance and began pursuing trial preparation.
The case proceeded to trial in early 2001. Mr. Fox was found guilty of the charge and specification. As a result, he was sentenced to the mandatory term of twenty years to life following a three-year term of incarceration for the use of a firearm.
New counsel has been appointed to represent Mr. Fox on appeal. Counsel has assigned five errors for consideration:
ASSIGNMENT OF ERROR I
 Appellant was denied effective assistance of counsel, in violation of his State and Federal Constitutional Rights.
 ASSIGNMENT OF ERROR II Appellant's right to a fair trial is violated under the State and Federal Constitutions when the state is permitted to introduce inflammatory hearsay and cumulative photographs, in violation of Evidence Rule 403(A) and where the court repeatedly admonishes defense counsel for improper behavior and improperly excludes defense testimony and exhibits.
 ASSIGNMENT OF ERROR III The trial court commits reversible error by not declaring a mistrial when in violation of Appellant's right to a fair trial under the State and Federal Constitutions.
 ASSIGNMENT OF ERROR IV The trial court commits reversible error by allowing the court room deputy to testify that she had observed a conversation between defense counsel and Appellant, yet was unable to hear what was said in that conversation, in order to impeach Defendant's credibility, in violation of Appellant's right to a fair trial under Article 1, Section 10 of the Ohio Constitution and Under the Fifth and Fourteenth Amendments to the United States' Constitution.
 ASSIGNMENT OF ERROR V The trial court erred when it entered judgment against Appellant when the evidence was insufficient to sustain a conviction and was not supported by the manifest weight of the evidence.
A review of the evidence presented at trial is necessary to address the fifth assignment of error. Once the trial evidence is understood, the effectiveness or ineffectiveness of counsel can be better assessed for purposes of the first assignment of error. Then the admissibility of individual pieces of evidence under the second and fourth assignments of error can be evaluated. Finally, the overall fairness of the proceedings and the wisdom of the trial court in refusing to grant a mistrial can be determined.
Preliminarily, we set forth the similar, yet distinct, standards by which we are bound in reviewing the first assignment of error, which as noted above challenges both the sufficiency of the evidence and the manifest weight of the evidence.
"The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." State v. Thompkins (1997), 78 Ohio St.3d 380, paragraph two of the syllabus. In Thompkins, the court explained at length the distinctions between the two standards:
 With respect to sufficiency of the evidence, '"sufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' Black's Law Dictionary (6 Ed. 1990) 1433. See, also, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Robinson (1955), 162 Ohio St. 486 * * * . In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. Tibbs v. Florida (1982), 457 U.S. 31, 45, * * * citing Jackson v. Virginia (1979), 443 U.S. 307 * * * .
When reviewing the sufficiency of the evidence to support a conviction, an appellate court must review the record to determine "whether the evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. In Jenks, the Supreme Court set forth the stringent standard of review to be applied in a sufficiency analysis:
 "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id.
In contrast, as explained in Thompkins, supra, a manifest weight analysis is slightly different:
 Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. Robinson, supra, 162 Ohio St. at 487 * * * . Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' (Emphasis added.) Black's, supra, at 1594.
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a '"thirteenth juror"' and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs, 457 U.S. at 42 * * * . See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175 * * * (`The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.').
Pursuant to the foregoing standards, we examine the record in a light most favorable to the prosecution to determine if the prosecution sufficiently proved beyond a reasonable doubt each element of the offense charged, and/or whether the jury "lost its way" in convicting appellant such that a manifest miscarriage of justice occurred.
The transcript of the proceedings in this case extends for seven volumes. The first volume is a hearing on a motion to suppress a statement given by Mr. Fox to police detectives. Because Mr. Fox had invoked his right to legal counsel and no counsel had been provided before questioning, the court suppressed the statement as evidence, at least during the state of Ohio's case-in-chief.
A jury was selected and a jury view was conducted. Following this, the trial judge gave some initial instructions of law to help the jurors understand their duties and role in the trial.
The state of Ohio presented its opening statement, following which defense counsel moved for a directed verdict on the issue of prior calculation and design. The trial court overruled the motion.
Counsel for Mr. Fox then gave an opening statement. The statement was interrupted repeatedly due to objections from the prosecution about whether or not the evidence would ever show what defense counsel claimed it would show. The opening statement was also interrupted due to objections that the statement was more an argument than a statement of what the evidence would show.
The first witness to testify was Ricky A. Crum, a Columbus police officer. Officer Crum was summoned to St. Ann's Hospital on March 19, 2000, to interview Mr. Fox and to take an assault report as the result of a beating Mr. Fox had received. Mr. Fox appeared to be intoxicated and kept falling asleep during the interview. Mr. Fox claimed that three African-American men kicked in his backdoor, fired gunshots and robbed him of $3,700. Mr. Fox kept claiming he had been set up, but did not elaborate about what he meant. Mr. Fox did not mention that anyone had been actually shot at his house.
The second witness to testify was Thomas Seevers, a detective with the crime scene search unit of the Columbus Division of Police. Detective Seevers was dispatched to investigate Mr. Fox's house the next morning. By that time, the body of Montel Young had been found at the residence. Detective Seevers and his partner diagrammed the scene and took photographs which were admitted into evidence. Counsel for Mr. Fox objected to the volume of pictures and to the graphic nature of some of them. The objections were overruled.
The photographs indicated that Montel Young had been shot one time just below her left armpit. Other photographs depicted injuries to Mr. Fox.
The third witness was Derek Hancock, who also is a police officer with the city of Columbus. Officer Hancock was dispatched by a homicide detective to see if a dead female was at the residence of Mr. Fox. When Officer Hancock arrived at the residence, he found Mr. Fox with swollen eyes and a bloodied face. Officer Hancock also found Montel Young's body on the floor, partially covered by a sheet. Medics were summoned to verify that she was dead.
Officer Hancock interviewed Mr. Fox, who indicated that he had been at home receiving sexual attention from Montel Young when three male African-Americans bashed in the backdoor, attacked him and stole $3,700. Mr. Fox believed that Montel Young had set him up to be robbed and he claimed that one of the robbers had shot Montel Young.
The fourth witness was Officer Mark L. Henson of the Columbus Division of Police. Officer Henson was also assigned to the crime scene search unit. He returned to Mr. Fox's residence on March 29, 2000, primarily to collect spent shell casings and bullet fragments from the basement of the residence.
The fifth witness was Renzo Padovan, a friend of Mr. Fox's, who was with him on the day of the beating and shooting. The two had installed a door in Mr. Fox's house and had drunk a large quantity of beer together. Mr. Fox had also shot a gun off in his basement twice.
Mr. Padovan recalled Mr. Fox as having a conversation with three African-American males in the alley behind Mr. Fox's house. Mr. Padovan claimed that one of those men had tried to rob him on an earlier occasion.
Later, Mr. Padovan and Mr. Fox went across the street to a bar where they drank more. After they returned to Mr. Fox's house later still, they smoked crack cocaine together and resumed drinking beer.
Soon thereafter, Montel Young came to the house and offered to engage in sexual activity with the men for a fee. Mr. Fox paid her and Montel Young began to perform oral sex on him while Mr. Padovan waited for his turn.
Mr. Padovan then heard knocking at the backdoor and Mr. Fox broke off what he was doing to answer the door. Three African-American men broke through the door, pushing Mr. Fox back into the middle of the house. Both Mr. Padovan and Mr. Fox were beaten with the butt of a shotgun and with a pistol. Mr. Padovan was knocked to the floor.
Apparently, the intruders found the money Mr. Fox had because they ran out the backdoor. Mr. Fox then grabbed a gun. Mr. Padovan heard a loud noise and saw Mr. Fox next run out the backdoor. When Mr. Padovan got up, he saw Montel Young holding her stomach and saying "I've been hit." (Tr. 299.) Mr. Padovan ran away from the house fearing the African-American men would return.
Later, Mr. Fox called Mr. Padovan at home and said "that girl was laying on the floor dead, what should he do." (Tr. 311.) Mr. Padovan advised to get rid of the gun and call the police.
Mr. Padovan was not sure whether any of the robbers shot a gun in the house or not. Mr. Padovan acknowledged lying to the police when first questioned about the robbery and homicide.
Later, he told police the same thing he said in court because Mr. Padovan's girlfriend had already told police detectives what he had told her. Mr. Padovan still considered Mr. Fox a friend, he testified.
On cross-examination, Mr. Padovan struggled to recall how many times he was interviewed by police. He acknowledged having a problem with alcohol and drug abuse. On several occasions, the questions asked by Mr. Fox's attorney were barred by objections from the prosecution.
Mr. Padovan indicated that he had been rendered unconscious or semi-conscious by a blow to the head. He was unclear about the number of shots fired and whether a shotgun was fired during the altercation. He recalled Mr. Fox grabbing a gun on the kitchen counter and then shooting.
The next witness to testify on behalf of the state of Ohio was Mark J. Hardy, a criminalist with the Columbus Division of Police. Mr. Hardy was qualified as an expert in firearm examination and identification. Mr. Hardy testified that pieces of a projectile from a 9 mm bullet recovered from the body of Montel Young was fired from the same gun as a projectile from a 9 mm bullet recovered from the basement of Mr. Fox's house. Mr. Hardy also identified a .38 caliber bullet fragment presented to him for examination.
Following the testimony of Mr. Hardy, the jury heard the testimony of Dorothy E. Dean, M.D. Dr. Dean is a forensic pathologist who works for the Franklin County Coroner. Dr. Dean performed the autopsy on the body of Montel Young and testified that Montel Young died as the result of a gunshot wound which entered her body just beneath her left armpit, punctured both of her lungs and passed through the major blood vessels coming out of her heart. The projectile which entered into Montel Young's body split up into fragments and most or all of the fragments were recovered during the autopsy.
An analysis of blood taken during the autopsy indicated the presence of alcohol, nicotine and cocaine in Montel Young's body at or shortly before the time of her death.
Dr. Dean testified that the gunshot wound would not have been immediately fatal, but that Dr. Dean could not say how long Montel Young lived after being shot.
Counsel for Mr. Fox attempted to elicit medical evidence about the effects of alcohol, cocaine and head injury on Mr. Fox and Mr. Padovan, but was prevented from pursuing this line of inquiry by rulings from the trial judge.
Homicide Detective Carl Rankin followed Dr. Dean to the witness stand. Detective Rankin was responsible for obtaining a search warrant for a blood sample from Mr. Fox and for witnessing the drawing of blood in the jail where Mr. Fox was being held. Detective Rankin also obtained a search warrant for weapons, ammunition, projectiles and spent shell casings at Mr. Fox's residence. The execution of the second search warrant resulted in the seizure of eight spent shell casings, seven bags of spent projectiles and one live 9 mm round.
On cross-examination, Detective Rankin was asked to review progress notes he had made with respect to an interview conducted of Mr. Padovan. Defense counsel wished to point out inconsistencies between what Mr. Padovan told police and his testimony in open court. The trial judge limited the inquiry, feeling hearsay was going to be elicited. Detective Rankin did testify that Mr. Padovan seemed evasive during the interview and gave differing answers to questions at different times in the interview.
Detective Rankin also testified on cross-examination that he talked to both Mr. Padovan and Patty Luptak, Mr. Padovan's girlfriend, during the approximately three-hour interview. After Mr. Padovan talked to his girlfriend, Mr. Padovan was less evasive.
Police Officer Mark Green followed Detective Rankin to the witness stand. Officer Green was assigned to the crime laboratory in the Franklin County Morgue. Officer Green identified the clothing taken from Montel Young's body and the projectile pieces removed from the body.
Debra Lambourne, an employee of the Columbus police crime laboratory testified next. Ms. Lambourne has primary responsibility for DNA testing. She testified as to her finding of matches between the blood of Mr. Fox or the blood of Montel Young with several items in the room where Montel Young's body was found.
Philip Paley, a Columbus police detective, next gave extensive testimony about the investigation which led up to the indictment of Mr. Fox. Detective Paley interviewed Mr. Fox on the morning Montel Young's body was found at Mr. Fox's residence. The interview was tape recorded and a cassette tape of the interview was played for the jury.
About forty-five minutes after the initial interview of Mr. Fox, a second interview was conducted. Defense counsel contested the playing of the tape of this second interview, arguing this part of the tape should be suppressed as evidence. A voir dire hearing was held and the trial court allowed the second portion of the tape to be played.
Detective Paley reviewed in his testimony a great deal of the evidence which had previously been presented to the jury.
During the cross-examination of Detective Paley, heated exchanges occurred between the trial judge, defense counsel and assistant prosecuting attorneys on the issue of whether Montel Young was tied to or related to the robbers who beat and robbed Mr. Fox. The trial judge in particular felt that defense counsel was attempting to place inadmissible evidence before the jury. Defense counsel also attempted to convey the thought that Detective Paley had been less than diligent in investigating the identity of the robbers and the facts about the robbery, as opposed to the shooting.
After the testimony of Detective Paley, the trial court recessed the trial for the week. The following Monday morning counsel for the state of Ohio filed a motion asking that one of the defense attorneys be held in contempt for the way some of the questioning of Detective Paley was conducted and other occurrences which are not in the evidentiary record. After extended argument, the trial court delayed ruling on the motion.
The state of Ohio then rested, following the admission of the state's exhibits. Counsel for Mr. Fox then made an oral "motion to dismiss," arguing that the evidence established self-defense. The trial court overruled the motion.
James E. Woosley was then called as a defense witness. Mr. Woosley had paid Mr. Fox $4,250 to do siding work for him. Mr. Woosley also testified about memory problems experienced by Mr. Padovan.
On cross-examination, Mr. Woosley testified about his recollection of various conversations he had with Mr. Fox after the shooting and about his recollection of what he had told police about their conversation.
The next witness the defense attempted to call was William Mosley, who formerly had lived with Montel Young. Mr. Mosley apparently was expected to give evidence which indicated that Montel Young was involved in a variety of thefts and which could be a basis for inferring that she was involved in the robbery which occurred that night. The trial judge ruled that the testimony would be an impermissible character assassination of the deceased and barred the testimony. As a result of the arguing, Mr. Mosley did not testify until later in the trial.
Mr. Fox then testified on his own behalf. Mr. Fox described his long-term relationship with Mr. Padovan and also the events which occurred on the day of the shooting. Mr. Fox recounted picking Mr. Padovan up so the two could work together.
Mr. Fox recalled having possession of two thirty-packs of beer, one of which was already on ice. The two started drinking early and consumed at least two twelve-packs of beer apiece over the course of the day.
Mr. Fox had a gun in his possession which he shot in the basement at least four times. After shooting the gun, he took it up to the main floor of the house. He stored the gun with a second gun nearby.
After Mr. Padovan and Mr. Fox did some work on a door, the two went across the street to the Tip Top Lounge to have a "couple drinks." While there, Mr. Fox let his stack of bills be seen in the bar, including by Montel Young.
After Mr. Fox and Mr. Padovan returned from the Tip Top Lounge, they each used some cocaine. Shortly thereafter, Montel Young came to the house and offered to "do" both Mr. Fox and Mr. Padovan for $20. They agreed and Montel Young started earning her $20.
Next, a knock was heard at the backdoor. Mr. Fox zipped up and went to the door. One of the men at the door supposedly asked for "my aunty" and another asked about "my sis." The men at the door then pushed their way in and demanded the money in Mr. Fox's pocket. One of the men knocked Mr. Padovan "out cold."
The men beat on Mr. Fox for several minutes. Mr. Fox recalls Montel Young as tripping him as he was going from one room to another, making it easier for the men to beat him. He also testified that she helped to hold him down while the men were searching him for his money.
After the money was found, the men and Montel Young fled to a mud room by the backdoor. Montel Young was picking up some of the money which apparently had fallen to the floor. One of the men supposedly threatened Mr. Fox with death.
About this time, Mr. Padovan started to regain consciousness. Mr. Fox grabbed the gun and headed for the door. Mr. Fox testified he heard a shot fired by one of the people on the porch, so he returned the fire. He claimed he could not see well, since he is blind in one eye and had blood flowing into the other.
Mr. Fox testified that other shots were fired by the assailants. Mr. Fox testified that he bumped into Montel Young, who was 5'11" and two hundred thirty-four pounds. He then chased after one of the men.
Later, Mr. Fox went to a hospital for treatment and returned home to find Montel Young's body in his house.
The next defense witness was Tequila D. Johnston, a niece of Montel Young. Ms. Johnston was called to testify about her aunt's reputation in the community for stealing from the men she served as a prostitute.
Mike Sanfillipo was called to the witness stand next, but the trial judge barred his testimony about prior statements of Mr. Padovan on a theory that the statements were hearsay and inadmissible.
William Mosley was the next defense witness. Mr. Mosley had formerly lived with Montel Young and knew her reputation in the community for being a thief and stealing from the men for whom she turned tricks.
In its rebuttal, the state of Ohio called Michele Byrne, an X-ray technician at St. Ann's hospital when Mr. Fox was treated after the robbery. Ms. Byrne already knew Mr. Fox when she saw him at the hospital because she had grown up as a friend of his sister. She described Mr. Fox as "really beat up." She claimed that Mr. Fox said he knew who had robbed him and that Mr. Fox expressed an intention to "get them on Monday."
Ms. Byrne described Mr. Fox as being drunk, high and not very coherent.
The defense, who had agreed to allow Ms. Byrne to testify out of the normal trial order, then re-called Mr. Padovan to the witness stand for the purpose of questioning him about a conversation he had with Mr. Sanfillipo in preparation for having Mr. Sanfillipo testify about the conversation.
The state of Ohio cross-examined Mr. Padovan about conversations Mr. Padovan had with one of the defense attorneys after Mr. Padovan testified for the state earlier. Mr. Padovan claimed the defense attorney was asked to help one of Mr. Padovan's friends who was in legal trouble and that the attorney was asked to let Mr. Padovan do work on a fence for pay. The state then had Mr. Padovan reaffirm that everything he had said in the state's case had been true.
Counsel for Mr. Fox requested the trial court to declare a mistrial due to the prejudicial information elicited from Mr. Padovan about conversations between Mr. Padovan and the attorney. The trial court did not grant a mistrial.
Mr. Sanfillipo testified next and stated that Mr. Padovan had told him that he did not know what had happened, but that Mr. Padovan was going to blame Mr. Fox rather than be charged with murder himself.
The state of Ohio next resumed its rebuttal case by calling Carolynn Bostic, a Franklin County Deputy Sheriff, to the witness stand. Deputy Bostic testified that Mr. Fox had a conversation with his counsel during a break in Mr. Fox's testimony. This testimony conflicted with Mr. Fox's testimony that he had not consulted with his lawyers during the break.
Finally, the state rested its rebuttal case.
Turning to the fifth assignment of error, the evidence before the jury fully supported a finding that Mr. Fox, after being seriously beaten and robbed, shot and killed Montel Young. The evidence therefore was sufficient to demonstrate that Mr. Fox purposely caused the death of Montel Young.
The evidence did not demonstrate any prior calculation and design, the legal finding which distinguishes aggravated murder from murder. In addressing the issue of proof of prior calculation and design, we are guided by the recent holding of State v. Coley (2001), 93 Ohio St.3d 253. The Supreme Court of Ohio indicated at page 263 of the opinion:
 As to "prior calculation and design," no "bright-line test" exists that "emphatically distinguishes between the presence of absence" of "prior calculation and design." State v. Taylor (1997), 78 Ohio St.3d 15, 20, 676 N.E.2d 82, 89. Yet "`prior calculation and design' is a more stringent element than the `deliberate and premeditated malice' * * * required under prior law." State v. Cotton (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, paragraph one of the syllabus. "Instantaneous deliberation is not sufficient * * * ." Id., paragraph two of the syllabus. "'[P]rior calculation and design' requires `a scheme designed to implement the calculated decision to kill.'" State v. D'Ambrosio (1993), 67 Ohio St.3d 185, 196, 616 N.E.2d 909, 918, quoting State v. Cotton, 56 Ohio St.2d at 11, 10 O.O. 3d at 6, 381 N.E.2d at 193.
Thus, the trial court erred in finding Mr. Fox guilty of aggravated murder, as opposed to murder. The evidence simply was insufficient to support the aggravated murder finding. To that extent, the fifth assignment of error must be sustained.
The evidence before the trial court suggests that Mr. Fox shot Montel Young in a fit of rage, blaming her for the robbery and beating which had just been inflicted on him. However, the evidence does not clearly indicate that Montel Young was in fact responsible for the robbery and beating which occurred. If she was not responsible, Mr. Fox did not have the legal right to vent his rage at her and have his offense reduced to voluntary manslaughter from a murder finding.
For a voluntary manslaughter to occur, the offender must act "while under the influence of sudden passion or a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force." See R.C. 2903.03. Since the evidence would support a finding that Montel Young was not involved in the robbery and merely had the misfortune of being present when the robbery and beating occurred, the evidence was sufficient to justify the conviction for the greater offense of murder, as opposed to voluntary manslaughter.
The manifest weight of the evidence does not mandate a reversal of the murder conviction, but does mandate a reversal of the aggravated murder conviction.
Again, the fifth assignment of error is sustained in part only and otherwise overruled.
We next address the first assignment of error.
The standard for evaluating the effective assistance of counsel is set forth in Strickland v. Washington (1984), 466 U.S. 668, 687, as follows:
 First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's error were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
Two defense attorneys represented Mr. Fox at trial. Both are experienced attorneys with a significant history of trying homicide cases. The trial judge who heard the case was on guard to protect the integrity of the trial process and had an awareness of the trial tactics used by at least one of the attorneys on other occasions. The tactics included blaming the police force for a shoddy investigation which resulted in his client being charged with aggravated murder and pushing the envelope as to what evidence could be placed before the jury.
Pushing the envelope with respect to the evidence led to several interchanges between the trial judge and defense counsel which cannot have had a favorable impact on the jury when it came time to deliberate. However, the interchange demonstrated that defense counsel was engaged in the process of attempting to further their client's interests, not failing to act as counsel.
Counsels' performance may in fact have contributed to the jury finding Mr. Fox guilty of more than the evidence supported. However, counsel were seeking to have their client found completely not guilty, as opposed to guilty of the lesser offense of voluntary manslaughter. This approach to the trial was a justifiable trial strategy.
Hindsight reveals a number of places in the trial transcript where a better approach could have been used and a better understanding of the Ohio Rules of Evidence could have been demonstrated. However, we cannot find that counsel rendered ineffective assistance of counsel, given the high standard for finding ineffective assistance mandated by the Supreme Court of the United States in Strickland.
The first assignment of error is overruled.
The second and fourth assignments of error assign as error specific evidentiary rulings made by the trial court.
The second assignment of error attacks the admission of a tape recording of an interview of Mr. Fox conducted on March 20, 2000 — the morning after the shooting. Although the evidence in the tape reflected badly on Mr. Fox in a number of ways, the evidence did not become inadmissible as a result. With respect to the tape and the other items questioned in the second assignment of error, the trial court acted within its sound discretion in handling the evidentiary rulings.
The second assignment of error is overruled.
The fourth assignment of error addresses the admissibility of the testimony of Deputy Bostic on the narrow topic of whether or not Mr. Fox talked to his attorneys during a break in his testimony.
The relevance of Deputy Bostic's testimony was minimal. Her testimony could not conceivably have affected the trial court's outcome, so no prejudicial error occurred.
The fourth assignment of error is overruled.
The third assignment of error questions the trial court's failure to grant a mistrial as a result of the information elicited about Mr. Padovan's conversation with one of the defense counsel.
The trial transcript reflects a long-term acquaintance between Mr. Padovan and one of the defense attorneys. The attorney had been representing Mr. Padovan's friends and perhaps Mr. Padovan himself off and on for many years. Under the circumstances, many defense attorneys would have declined the opportunity to represent Mr. Fox, who also had been friends with Mr. Padovan for many years. Under the circumstances, many attorneys would have avoided discussions about doing favors for the key prosecution witness who was expected to testify in response to a defense subpoena within the next few days. This defense attorney took the call and had an ill-advised conversation with the witness.
We cannot say that the trial judge abused his discretion when he refused to grant a mistrial after this conversation was revealed in open court. Mr. Padovan testified again that what he said in open court earlier had been the truth. The jury presumably was capable of distinguishing between the guilt of the accused and the actions of his attorney. The trial did not have to start over because one of the two defense attorneys engaged in ethically questionable conduct.
The third assignment of error is overruled.
In review, the first, second, third and fourth assignments of error are overruled. The fifth assignment of error is sustained with respect to the weight and sufficiency of the evidence on the element of prior calculation and design. As a result, the conviction for aggravated murder with a gun specification is modified to a conviction on the lesser included offense of murder with a gun specification. The sentence of Mr. Fox on aggravated murder with a gun specification is vacated and the case is remanded for sentencing on the lesser included offense of murder with a gun specification.
Judgment vacated and cause remanded with instructions.
BOWMAN and BROWN, JJ., concur.