OPINION
Appellant Lori Kimble appeals from the decision of the Harrison County Juvenile Court which adjudicated two children abused, adjudicated two children dependent, and entered a dispositional order granting custody to appellee Gary Kimble and restricting appellant's visitation to supervised. We have before us two jurisdictional issues, two issues on whether the requisite burden was met, and two dispositional issues. For the following reasons, the judgment of the trial court is affirmed.
 STATEMENT OF THE CASE
Lori and Gary have four children, Chelsey, Jessica, Kensie and Seth. The couple separated in 1992 and filed for divorce in 1996. On December 27, 1997, during a weekend visitation, Gary brought the children to the police station to relate their complaints regarding Lori's treatment of them. The matter was referred to the Department of Human Services. The children have resided with Gary since the date the children disclosed their troubles, apparently under a voluntary safety agreement. In January 1998, Gary filed a motion for custody and a domestic violence petition, which may never have been served.
On June 29, 1998, with the divorce case still pending, the Department filed a complaint in the juvenile division asserting neglect as a result of insufficient food supplies, abuse as a result of allegations related by Jessica and Chelsey, and dependency as a result of allegations that the younger two children were at risk of abuse due to abuse of their siblings. Lori moved for dismissal in the juvenile court based on the preexistence of the domestic relations case. After briefing and hearings on the issue, the juvenile court denied the motion.
The adjudicatory hearing began on December 15, 1998 and continued on February 23, 1999. On March 25, 1999, the court found no evidence of neglect. However, the court found Jessica and Chelsey to be abused and Kensie and Seth to be dependent. The dispositional hearing then proceeded on May 11, 1999. On June 2, 1999, the court ordered that Gary would be the residential parent, the children would continue counseling, Lori would attend a parenting skills class, family counseling would begin when recommended, and Lori would exercise visitation in a supervised environment (which could be modified upon completion of the class and recommendation from the counselor).
Lori filed timely notice of appeal. The case was fully briefed in November 2000; however, the assigned judge left office. Thereafter, this case was stayed pending a Supreme Court decision on one of the jurisdictional issues. When the Supreme Court case was voluntarily dismissed, the stay was lifted. The current writing judge was recently assigned the case on March 25, 2002.
 ASSIGNMENT OF ERROR NUMBER ONE
Lori's first assignment of error provides:
 "THE TRIAL COURT LACKED JURISDICTION TO ENTER JUDGMENT IN THIS CASE, AND SHOULD HAVE DISMISSED THE CASE, BECAUSE THE DISPOSITIONAL HEARING WAS MORE THAN NINETY DAYS AFTER THE COMPLAINT WAS FILED AND MORE THAN THIRTY (30) DAYS AFTER THE ADJUDICATORY HEARING."
The complaint was filed in this case on June 28, 1998. The adjudicatory hearings were held on December 15, 1998 and February 23, 1999. The dispositional hearing was held on May 11, 1999. Lori complains that the court violated two different time requirements in R.C. 2151.35(B)(1) (which outlines the hearing procedure) by holding the dispositional hearing 317 days after the complaint was filed and 47 days after the last adjudicatory hearing. Lori concludes that the court should have dismissed the case because it lost jurisdiction when it failed to follow the statutory time limitations. Gary responds by arguing that the time limitations are not jurisdictional as they are directory rather than mandatory and by contending that Lori waived any time limits by failing to seek dismissal on these grounds and by orally stating on the record that all time requirements would be waived.
The relevant statute provides in pertinent part:
"The dispositional hearing may not be held more than thirty days afterthe adjudicatory hearing is held. The court, upon request of any party or the guardian ad litem of the child, may continue a dispositional hearing for a reasonable time not to exceed the time limits set forth in this division to enable a party to obtain or consult counsel. Thedispositional hearing shall not be held more than ninety days after thedate on which the complaint in the case was filed."
"If the dispositional hearing is not held within the period of timerequired by this division, the court, on its own motion or the motion ofany party or the guardian ad litem of the child, shall dismiss thecomplaint without prejudice." R.C. 2151.35(B)(1). (Emphasis added).
We note that these same time directives for the dispositional hearing are set forth in Juv.R. 34(A).
The Supreme Court has analyzed past versions of time schedules for adjudicatory and dispositional hearings set forth in prior versions of Juv.R. 29(A) and 34(A). In Linger v. Weiss (1979), 57 Ohio St.2d 97, 99, the Supreme Court held that the juvenile court would not lose jurisdiction for failing to comply with these rules. The Court reasoned that the jurisdiction of the juvenile courts is a creation of statutory law. Id. at 99-100, citing R.C. 2151.23(A) (which states the the juvenile courts have exclusive jurisdiction over children who are alleged to be abused, neglected, or dependent). The court noted that the juvenile rules establish uniform procedure and are not to be construed in a way affecting jurisdiction. Id. at 100.
Since that time, statutes have been enacted which codify time limits concerning adjudicatory and dispositional hearings. Pursuant to R.C.2151.28(A)(2), an adjudicatory hearing shall be held not later than thirty days after the complaint is filed. The court can continue the hearing for certain reasons; however, it "shall not be held later than sixty days after the date on which the complaint was filed." R.C.2151.28(A)(2)(b). This statute refers to the time limits of R.C. 2151.35
for dispositional hearings and notes, "in no case shall the dispositional hearing be held later than ninety days after the date on which the complaint was filed." R.C. 2151.28(B)(3). Finally, this statute states:
"The failure of the court to hold an adjudicatory hearing within any time period set forth in division (A)(2) of this section does not affect the ability of the court to issue any order under this chapter and does not provide any basis for attacking the jurisdiction of the court or the validity of any order of the court." R.C. 2151.28(K).
Similar language is contained in Juv.R. 29(A), which deals with the adjudicatory hearing. We should note that this division does not mention that the dispositional hearing time limits are not jurisdictional and the other statute and rule dealing with the time limits for the dispositional hearing do not contain this language. This comparison, combined with the language that the court shall dismiss the complaint for violation of the time limits, would seem to be Lori's best argument as to why the dispositional time limits are jurisdictional. Yet, she does not raise this argument.
The case of In re Davis (1999), 84 Ohio St.3d 520, is the focus of the argument of both sides in this matter. In that case, the issue was whether R.C. 2151.35(B)(3), which states that the court shall issue a judgment entry within seven days after the dispositional hearing, is jurisdictional. The Court stated that the word "shall" is usually mandatory, meaning that noncompliance results in a void judgment. Id. at 522. The court noted an exception to the mandatory nature of "shall" exists where the statute is providing a time for performance of official duties, especially where the time is merely for convenience and orderly procedure. Id. The court then noted an exception to the exception where "the nature of the act to be performed or the phraseology of the statute or of other statutes relating to the same subject-matter is such that the designation of time must be considered a limitation upon the power of the officer." Id. The Court concluded that R.C. 2151.35 does not include any expression of intent to restrict the jurisdiction of the court for untimeliness and noted that reading the time requirement as jurisdictional would defeat the very purposes the time limit was designed to protect. Id. at 522-523. Finally, the court advised that a party could file for a writ of procedendo where the court fails to act within the seven-day time limit and held that the party cannot raise the delay in their appeal where they failed to avail themselves of this available avenue. Id. at 523-524.
Gary argues that the same rationale applies to the case before us. Lori notes that the seven-day time limit in R.C. 2151.35(B)(3) at issue inDavis did not contain the additional language in R.C. 2151.35(B)(1) providing that the court shall dismiss without prejudice on its own motion or motion of a party or the guardian ad litem. In fact, a concurrence inDavis cited the R.C. 2151.35(B)(1) dismissal provision for its proposition that had the legislature desired to make the time limit jurisdictional, it knew how to do so. Davis, 84 Ohio St.3d at 525-526
(Resnick, J., concurring in judgment).
The Fifth District has reversed cases on these grounds multiple times.In re Chambers (Mar. 15, 2001), Tuscarawas App. No. 2000AP080058 (holding that the language of R.C. 2151.35(B)(1) is mandatory and cannot be waived by a party's failure to object); In the Matter of Velentine (July 25, 1995), Coshocton App. No. 94CA17; In the Matter of Taeovonni (June 15, 1995), Tuscarawas App. Nos. 94AP080054 and 94AP080058; Matter of Grimm
(Dec. 16, 1993), Tuscarawas App. No. 93AP060042.
When the Ninth District did likewise, the Supreme Court accepted jurisdiction to hear the appeal. In re Olah (Aug. 23, 2000), Lorain App. No. 99CA007318, conflict certified in (2000), 90 Ohio St.3d 1491, and discretionary appeal allowed in (2000), 90 Ohio St.3d 1493. As aforementioned, the Supreme Court's acceptance of jurisdiction to resolve the issue is the reason why this court stayed the case. Yet, Olah was dismissed prior to decision. The Ninth District overturned their Olah
decision. In re Jones (May 2, 2001), Summit App. No. 20306. The Ninth District held that the time limit for holding the dispositional hearing is not jurisdictional and that a parent may waive the time requirements.Id.
We agree with the Ninth District's current position. Id. See, also, Inre King-Bolen (Oct. 10, 2001), Medina App. Nos. CA-3196-M, CA3200-M, CA3201-M, CA3231-M. The statute does not clearly deprive the court of jurisdiction and prohibit waivers of the time requirements. An unambiguous statute would specifically state that the court has no jurisdiction to hold a dispositional hearing outside the time limits or state that cases shall be automatically dismissed without prejudice, explicitly requiring the court to raise the issue sua sponte if a party or guardian ad litem does not. See State v. Bellman (1999),86 Ohio St.3d 208, 210 (noting how the language of R.C. 2921.401 explicitly states that a court does not have jurisdiction once the time runs on an untried indictment after a prisoner requests trial).
As we are called upon to interpret an ambiguous statute to determine legislative intent, we review the purpose of the statute. State ex rel.Mason v. Griffin (2000), 90 Ohio St.3d 299, 302. We thus reiterate the purposes and concerns expressed by the Court in Davis, where the Court noted that reading the time requirement as jurisdictional would defeat the very purposes the time limit was designed to protect. Davis,84 Ohio St.3d at 523 (noting that the consequences of dismissal and refiling after all hearings are held is not in the best interests of the children). See, also, In re Chapman (Apr. 10, 1998), Ashtabula App. No. 97-A-0001 (where the Eleventh District stated that reversal on appeal would not afford the appellant the procedural right he wishes to enforce, that being a speedy disposition, and instructed that a request for a writ should have been filed).
We also note that in Discplinary Counsel v. Slodov (1996),74 Ohio St.3d 618, an attorney, who was being disciplined for telling his client to leave the courthouse, supported his actions by arguing that R.C. 2151.35(B)(1) precluded the court from hearing the matter on the ninety-first day after the complaint. In a footnote, the Court stated that the argument as to the deadline being a jurisdictional requirement was previously rejected by the Court. Id. at 623, fn. 1, citing Howardv. Catholic Social Serv. (1994), 70 Ohio St.3d 141. We do not use this footnote as our entire support for our current holding because (1) it was dicta and (2) Howard only deals with whether a court loses jurisdiction to rule on a complaint that is dismissed as untimely and then refiled and merely notes that the statute provides for a dismissal without prejudice.
We liken the time limit in this case to that of speedy trial time limits. If the defendant files a motion, the court shall dismiss the case (with prejudice in the case of speedy trial). However, if the defendant fails to timely raise the issue in the trial court, he has waived his right to a speedy trial. See, e.g., Village of Montpelier v. Greeno
(1986), 25 Ohio St.3d 170, 171 (holding that speedy trial violations are not jurisdictional).
Besides, the Ninth and Eleventh Districts, the Third, Sixth and Twelfth Districts have also specifically ruled on the issue in favor of jurisdiction and waiver. See, e.g., In re Kutzli (1991), 71 Ohio App.3d 843
(Third District); In re Bailey (Apr. 17, 1998), Lucas App. No. L-96-363 (Sixth District); In re N.B. (Apr. 15, 1996), Butler App. Nos. CA95-02-031, CA95-03-056, CA05-06-017 (Twelfth District) (all cases certified by the Supreme Court as being in conflict with Olah). As such, we hereby follow the majority of districts and disagree with the position of the Fifth District.
In accordance, we hold that although a court may sua sponte dismiss a case and when so dismissing it must do so without prejudice, R.C.2151.35(B)(1) is not self-executing. Hence, the parties can waive the time limits. Here, not only did Lori implicitly waive the time limits (by not asking for dismissal on the grounds of this statute and then seeking an extraordinary writ), she expressly waived all time requirements on the record. (Tr. 150). Therefore, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER TWO
Lori's second assignment of error contends:
 "THE TRIAL COURT LACKED JURISDICTION TO ENTER JUDGMENT IN THIS CASE BECAUSE THE CUSTODY ISSUE WAS PREVIOUSLY PENDING IN THE DOMESTIC RELATIONS COURT."
At the time the complaint was filed in the juvenile court in June 1998, a divorce action was pending which would have eventually determined custody of the children. In August 1998, Lori filed a motion to dismiss in juvenile court, alleging that the juvenile court had no jurisdiction because of the existence of the divorce case. The juvenile court denied her motion and retained jurisdiction. She now claims that the juvenile court lacked jurisdiction in this matter as the exclusive jurisdiction rested in the court presiding over the divorce action. She argues that if a divorce is pending, a juvenile court cannot get involved under the "guise" of abuse, neglect, or dependency. As Gary responds, a juvenile court cannot ignore such allegations once a complaint is filed; it has a duty to hear the complaint regardless of whether the parents happen to be in the process of getting divorced.
Pursuant to R.C. 2151.23(A)(1), the juvenile court has exclusive original jurisdiction concerning any child who is alleged to be abused, neglected, or dependent. The juvenile court also has exclusive original jurisdiction to determine the custody of any child not the ward of another court of this state. R.C. 2151.23(A)(2).
The Supreme Court has specifically held that a juvenile court has jurisdiction to determine the custody of children, even when those children are already the subject of a divorce decree. In re Poling
(1992), 64 Ohio St.3d 211, 215 (also noting concurrent jurisdiction with the court who presided over the divorce). The Court explained that "ward" generally means a child or incompetent placed by the court under the care and supervision of a guardian or conservator. Id. at 214. The Court stated that when a court grants custody in a divorce case, it is not placing itself in the position of guardian of that child. Id. Thus, children subject to custody awards are not wards of the court. Id. (warning courts not to strain the definition of ward beyond its common meaning). See, also, In re Guardianship of Kinney (June 14, 2000), Belmont App. No. 99BA19 (noting how the juvenile court could have acquired jurisdiction if a motion for custody had been filed prior to the time the child became a ward of the probate court by means of an application for guardianship); Lake Cty. Dept. of Hum. Serv. v. Adam
(1999), 82 Ohio App.3d 494, 496 (upholding a juvenile court's dismissal due to the existence of a guardianship over the child in the probate court).
If children who are actually subject to a custody order in a divorce decree are not wards of the court, then children whose parents are in the process of obtaining a divorce and subject to no order are not wards of a court either. See, e.g., Kovalak v. Kovalak (Aug. 6, 1998), Cuyahoga App. No. 73100. Accordingly, the juvenile court had jurisdiction to proceed in this action.
Under this assignment, Lori mentions that the children had lived in Tuscarawas County with their father for months prior to the filing of the complaint. Because she does not actually set forth arguments on this issue, we need not delve too deeply into the matter. However, we will note that this issue deals with venue, not jurisdiction. Generally, venue can be waived. See, e.g., State v. Coley (2001), 93 Ohio St.3d 253, 258; Civ.R.12(H). Regardless, it is discretionary under juvenile law. See R.C. 2151.271; Juv.R. 11(A) (stating the case "may" be transferred to the county of residence). See, also, Ackerman v. Lucas Cty. Child. Serv. (1989), 49 Ohio App.3d 14, 15.
Finally, Lori contends that the complaint was lacking in that it failed to state whether or not temporary or permanent custody was being sought. She states that this procedural defect requires reversal. Pursuant to Juv.R. 10(D), a complaint seeking permanent custody of a child shall state that permanent custody is sought. Pursuant to Juv.R. 10(E), a complaint seeking temporary custody of a child shall state that temporary custody is sought. Similarly, R.C. 2151.27(C) states that if the complainant in an abuse, neglect, or dependency case, desires permanent custody or temporary custody (or placement in a planned permanent living arrangement), the complaint shall contain a prayer specifically requesting such relief. Additionally, R.C. 2151.353(B) provides that no order for permanent or temporary custody shall be made unless the complaint contained a prayer for such remedy.
These laws require disclosure if permanent or temporary custody is being sought; they do not conversely require disclosure of a negative in cases where such remedies are not being sought. Here, the Department, who was the complainant, did not wish to obtain temporary or permanent custody of the children. Rather, the children's father desired legal custody; such concept is not related to permanent custody. Under R.C.2151.353(A)(3), the court is permitted to award legal custody to a parent, or any other person, who files a request prior to the dispositional hearing. In the case before us, Gary moved for legal custody in August 1998, well before any hearing. In accordance, the complaint does not exhibit fatal, jurisdictional or procedural defects based on its failure to mention temporary or permanent custody. This assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER THREE
Appellant's third assignment of error alleges:
 "THE TRIAL COURT ERRED IN FINDING THAT CHELSEY AND JESSICA ARE ABUSED CHILDREN."
Lori complains that the allegations of abuse were not proven by clear and convincing evidence. She claims that the testimony was biased and inconclusive. Gary responds that the trial court was in the best position to evaluate the credibility of testimony and that sufficient evidence was presented from which a rational trier of fact could find clear and convincing evidence of abuse under R.C. 2151.03(D).
First, we note that this case presents a juvenile adjudication of the status of the children as abused rather than a criminal case of child abuse. See In re Baby Blackshear (2000), 90 Ohio St.3d 197, 203, fn. 2 (distinguishing a civil case under R.C. 2151.031(D) from a criminal abuse case). Abuse need not be established beyond a reasonable doubt, but must only be established by clear and convincing evidence. R.C. 2151.35. Clear and convincing evidence is that which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. Disciplinary Counsel v. Furth (2001), 93 Ohio St.3d 173,182.
In the case at bar, the relevant statutory allegation of abuse is contained in R.C. 2151.031(D). This division defines an abused child as any child who:
"Because of the acts of his parents, guardian, or custodian, suffers physical or mental injury that harms or threatens to harm the child's health or welfare."
The corporal punishment exception in R.C. 2151.031(C) is explicitly conceded to be inapplicable to the relevant statutory division in this case, R.C. 2151.031(D). Hence, references to the exception and its purposes by the parties or the dissent merely serve to cloud the issue. In fact, R.C. 2151.031 was specifically broadened, through the passing of 1988 H 89, to add division (D) for children who do not "exhibit[*] evidence of any physical or mental injury * * * which is at variance with the history given of it" and for those who did exhibit this injury but who would not be classified as abused due to the corporal punishment exception.
As for the statutory interpretation of the words "health or welfare" conducted by the dissent, we initially point out three preliminary items. One, the parties do not raise these arguments. Two, due to the existence of the "or" connector, harm or threatened harm to either healthor welfare is sufficient. Three, one should note that the injury can either harm or threaten to harm the child's health or welfare. Moreover, both health and welfare are basic words of common usage and, we fail to see the ambiguity in either word. Even if the term "welfare" escapes precise definition, the term "health" does not. An ambiguity is an uncertainty of meaning or intention in a statutory provision. Id. at 79. When the Ohio Supreme Court had the opportunity to review an application of R.C. 2151.031(D), they did not mention any ambiguity. See Blackshear,90 Ohio St.3d 197 (pronouncing a per se rule that a child born with drugs in its system has been injured by an action of the parent and is abused). Although they do not specifically mention health or welfare, they impliedly found health or welfare affected since harming or threatening to harm health or welfare is a statutory requirement under R.C. 2151.031(D). See Id. at 200. In fact, the Supreme Court characterized the statutory provision as possessing "plain language."Id. at 199. The dissent in the case at bar seems to agree with the dissent in Blackshear which complained about a lack of determination whether the parent's action actually harmed or threatened to harm the child. Id. at 202 (Cook, J., dissenting). Although, we note that not even the dissent in Blackshear took issue with the words health or welfare.[1]
Moreover, even if we assume arguendo that an ambiguity exists, the relevant rule of construction directs us to interpret the statute towards protecting the children. The Supreme Court advised that "2151.01 mandates the court to liberally construe and interpret the sections of R.C. Chapter 2151, so as to provide the care and protection of children and their constitutional and legal rights." Blackshear,90 Ohio St.3d at 203, fn. 2. The Court did not advise lower courts to apply the statutes strictly to protect parents' reputations.
Moving to the issue placed before us in the appeal, this court believes that there exists competent, credible evidence to support the trial court's determination that the state presented clear and convincing evidence that, because of the acts of the mother, the children suffered physical or mental injury which at the very least threatened to harm their health or welfare. See In re Riddle (1997), 79 Ohio St.3d 259, 261-262
(for review of the standard). Hence, we shall now review the evidence in support of our holding, which is all the parties really asked us to do to begin with.
Lori, who is the mother in this case, admitted to the social worker that she "over disciplined them." (Tr. 6). Chelsey, age twelve at the time of removal, has a scar on her face from an incident where Lori threw her down. (Tr. 5). Lori's sister confirmed that Lori admitted her fault in this incident to her and that Chelsey was injured enough to require a visit to the emergency room where stitches were administered. (Tr. 227). Lori testified that the scar at issue on Chelsey's face was caused when Chelsey jumped off a chair in her bedroom. (Tr. 170). (For clarity, we note that two scars were mentioned in the testimony, one undisputedly from a car accident and one disputed scar).
Chelsey testified that Lori got angry a lot and expressed that anger by hitting the children, throwing them down, and dragging them by their hair. (Tr. 64). She stated that when Lori slapped her, it was more than a couple slaps across the face at a time. (Tr. 68). When asked how often, she stated "a lot" especially in December 1997. When pressed to be more specific about the amount of slappings during December she responded, "every three days at least." (Tr. 68). She explained that she told her father around Christmas because it started getting bad. She also opined that although some slaps were Lori's version of discipline, some occurred for no reason at all. (Tr. 80).
Jessica, who was ten at the time of removal, testified that she was slapped "maybe every other day." (Tr. 83). She confirmed that Lori pulled her and Chelsey's hair. (Tr. 87). She also confirmed that her younger siblings had been slapped also. (Tr. 82). Jessica revealed that at times, Lori's anger, which resulted in slapping, was brought on by their failure to explain whether their father had a girlfriend. (Tr. 87-89). Lori admitted to her inquiries about the father's life and admitted the inquiries upset Jessica, but she denied getting angry. (Tr. 199, 204).
Lori's sister testified that Lori often said things to her children like, "you're so fucking stupid." (Tr. 226, 232-233). She also witnessed Chelsey being smacked on the arm for spilling pop. This incident upset the sister enough to leave, at which time Lori scolded Chelsey that it was her fault that her aunt was leaving. (Tr. 226).
Lori's other sister testified that Lori would often smack the children across the face back-handed and grab them in a forceful manner, "in a way you just don't grab somebody." (Tr. 253-254). She stated that during one incident, she left the house so she did not have to hear the continued smacking on the children's backs and legs, which she described as abusive and more than just discipline. (Tr. 254).
Yet a third sister of Lori testified that Lori would grab her children by the shoulders in a "fierce" way and shake them in a "violent" way. (Tr. 264, 271). She stated that Lori would walk past them so hard that she would knock them over. (Tr. 271). She saw Lori smack Chelsey in the mouth leaving a red mark after Chelsey was "lipping off." (Tr. 264, 268). She described this as "smacking her so hard that it made me remember that." (Tr. 271). The last time she saw the children with their mother, they appeared fearful and unhappy. (Tr. 265).
Lori's mother testified that Lori cannot control her temper. She stated that Lori would frequently "swat" or slap the children and yell at them. (Tr. 242, 247). She disclosed that Lori "would use words on them that I would never, never use on anybody," calling them, "little F'ers." (Tr. 242-243).
The children's father testified that in the past, he witnessed Lori shove the children and "throw the children through the air airborne." He also stated that he previously saw her pull their hair. He mentioned ordering Lori to discontinue this behavior prior to separation. (Tr. 279).
Lori disputed hitting her children on an almost daily basis. (Tr. 178). She claimed that she only "smacked their butts" with her hand a couple of times, admitting this happened only once or twice with Jessica. (Tr. 280, 203). She admitted that she backhanded Chelsey and Jessica across their faces. She explained that she backhanded Chelsey because Chelsey stated that she hated everybody and everything. (Tr. 180). She alleged that she only did this to Chelsey one time, but "there may have been one other time, and that's just to be safe." (Tr. 200). She stated that she only recalls backhanding Jessica across the face once. She even disclosed that the reason for this was that, when the father arrived to pick the children up for visitation, Jessica refused to peek into her father's car window to see if he was in there and report back to her mother before the children would be allowed to leave. (Tr. 203). She stated that she did not recall hitting the girls on their arms and backs.
She then testified that she did not intentionally pull Chelsey's hair but that it might have got in the way as she was separating the girls during a spat. (Tr. 210). Lori opined that her sisters were lying under oath. (Tr. 210-211). She also admitted to making the girls get out of her car and walk behind it as she drove down the street. (Tr. 211).
The dissent seems to claim that the testimony of the two daughters is uncorroborated. Yet, the daughters' testimony corroborates each other. Jessica testified that she saw her mom pull Chelsey's hair. (Tr. 87). They both witnessed each other being slapped. (Tr. 68, 82). Corroboration also exists in the testimony or Lori's mother and sister about incidents of multiple slappings. Regardless, corroboration is unnecessary. The trial court is permitted to believe the girls' testimony. The dissent also complains that there existed no expert testimony. Yet, it does not require an expert to determine if a certain scenario in a home can threaten the health or welfare of a child.
Lori asks us to disbelieve the state's witnesses and/or find that harm to health or welfare is not threatened by the repeated incidents of multiple slappings, shoving, grabbing/shaking, and hair-pulling. The fact that the girls' teacher did not notice any bruises or anything unusual prior to removal, that the girls received good grades according to their mother, and that they participated in extracurricular activities does not mean that the mother did not take the actions alleged. In fact, Chelsey specifically stated that she would not tell her teachers because they were her mother's friend. (Tr. 79). Other testimony established that the slapping caused temporary red marks, not bruising.
In conclusion, the trial court was in the best position to evaluate the credibility of all witnesses. See, e.g., Seasons Coal Co. v. Cleveland
(1984), 10 Ohio St.3d 77, 80 (stating that the court occupies the superior position from which to evaluate the weight of the evidence and the demeanor, voice inflections, and gestures of the witnesses). The trial court was entitled to disbelieve Lori's testimony that she only hit each girl once in the face on one occasion. The court was entitled to disbelieve her testimony that Chelsey needed stitches due to her own clumsiness. The court was within its province to believe that the girls were subjected to multiple slaps across the face on multiple occasions and that they were violently shoved, grabbed, and shaken and was within its province to determine that these actions threatened to harm the health or welfare of the children. In accordance, there exists competent, credible evidence to produce a firm belief in the mind of the trial court and meet the clear and convincing standard of proof. SeeMyers v. Garson (1993), 66 Ohio St.3d 610, 614 (urging deference by reviewing courts). In accordance, we shall not disturb the decision of the trial court. This assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER FOUR
Lori's fourth assignment of error contends:
 "THE TRIAL COURT ERRED IN FINDING THAT KENSIE AND SETH KIMBLE ARE DEPENDENT CHILDREN."
Pursuant to R.C. 2151.04(D), a child is dependent when both of the following apply: (1) the child resides in a house in which a parent or other household member committed an act against a sibling who has been adjudicated abused, neglected, or dependent; and (2) because of the circumstances surrounding that adjudication and the other conditions in the household, the child is in danger of being abused or neglected by that actor.
Lori's first argument relies on her prior argument that Jessica and Chelsey were not abused. Because we overruled this argument under the third assignment of error, we need not reiterate our position. Lori's remaining argument merely states in one sentence, "there simply was insufficient, credible evidence to support a finding by clear and convincing evidence that Kensie or Seth were `in danger of being abused'."
Kensie and Seth did not testify at the adjudicatory hearing. However, the older girls voiced their concern for their younger siblings. Testimony established that the younger children had been slapped before and that derogatory language was directed at all children. (Tr. 65-66, 82). See In re Schuerman (1991), 74 Ohio App.3d 528, 534. Other witnesses confirmed Lori's lack of self-control concerning her temper. The circumstances surrounding the abuse of the older children were before the court, as were other circumstances that existed at the household. The court was in the best position to determine whether credible evidence was presented from which it could be inferred that Lori's abuse of the older children and other circumstances in the household created a danger that the younger children would be abused in the future. Thus, the court did not err in finding clear and convincing evidence that the younger children were in danger of being abused. This assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER FIVE
Lori's fifth assignment of error provides:
"THE COURT ERRED IN MAKING ITS DISPOSITIONAL RULING."
Under this assignment, Lori contends that the dispositional ruling was improper. She complains that the court allowed Gary to choose the third-party supervisor for the supervised visitation. She also suggests that supervised visitation is unnecessary for the two younger children.
Pursuant to R.C. 2151.35(A)(1), after a court finds abuse, neglect, or dependency by clear and convincing evidence, the court then proceeds to hold a dispositional hearing and hear evidence as to the proper disposition. As aforementioned, legal custody to a parent who filed a motion prior to the dispositional hearing is one of the court's dispositional choices. R.C. 2151.353(A)(3).
The court heard a multitude of evidence at a bifurcated dispositional hearing. It was established that the Department recommended that the children be placed with Gary and not with Lori. A representative of the Department noted that the home study of Gary's residence was favorable. The children's counselor testified that she has been counseling each child frequently for over a year. She noted that Chelsey does not feel wanted by Lori due to the abuse and name-calling. She related that Jessica feels that Lori does not pay much attention to her at visitations. These two older children consistently indicate that they wish to remain at Gary's house. The two younger children fluctuate in their desire. (Tr. 13). The counselor revealed that Lori told the children that she knew what they said in counseling, thus ruining the counselor's relationship with the children for awhile as they feared retaliation by Lori for what they disclosed. The counselor described how Seth is happier and has positively changed his attitude about himself, noting that he no longer hits himself in the head and calls himself dumb. (Tr. 14). The counselor opined that it was important for the children to stay together and to stay with their father where they feel safe. She also recommended supervised visitation due to the children's fears. She disclosed that the children expressed fear during a visitation when Lori got angry.
Lori's counselor testified that Lori has emotional limitations. This counselor recommended family therapy which the children's counselor did not wish to begin until a stable placement was ordered. Lori's counselor disclosed that after the adjudication, Lori admitted there may have been more hitting and yelling than she had originally realized but still not as much as expressed at trial. (Tr. 29). Lori told her that she would prefer the children to live together. (Tr. 33). Lori's counselor had no objection to supervised visitation except that she suggested a professional monitor who could give feedback, like an extension of family counseling.
The initial caseworker at the Department then testified. She stated that she visited Gary's residence once a month after Lori agreed to the initial safety plan. She testified that she noticed changes in the children in that they are more spontaneous and loving with their father. This caseworker also recommended that the children remain with their father. (Tr. 43).
Lori's sister testified and gave examples of the differences in the children's attitude from the past and present. She opined that the children were intimidated and degraded by Lori. Lori's other sister testified likewise and noted how Gary explains why he is angry rather than hitting and yelling. This sister witnessed a visitation with Lori where she noticed that Lori gives all her attention to Kensie and Seth, ignores Jessica and Chelsey, and still talks down and acts mean to the children. She opined that the children were better off with Gary.
The children's caretaker testified. She stated that she picks the children up from school and waits with them at home until their father is finished with work, and she watches Seth two days a week on his days off from kindergarten. She testified as to the differences in the children from the day they began to live with Gary to the present. She noted that she will be the children's caretaker for the indefinite future if they remain in Gary's custody. Gary's friend testified as to his observations about the children's positive changes.
Finally, Gary testified in depth about the physical and emotional characteristics of the children before and after they came to live with him. He noted their grades and activities. He described their living quarters. He expressed a desire for supervised visitation but with a goal towards nonsupervised. The following characteristics of the supervised visitation should be noted here: the supervisor has included various individuals such as Gary's mother, Lori's sister, the initial caseworker, the children's caretaker; it occurs in various public locations; and it has been provided more than once a week in some instances.
In her case, Lori presented her own testimony. Lori stated that her visitation is two hours per week, and it is usually arranged through Gary's mother. She opined that anything the children tell the judge would not be of their own free will. The children were then questioned by the judge. They expressed a desire to stay together. Chelsey noted that during visitation, Lori spends her time concentrating on the younger children and telling them they will be living together soon. Jessica complained that Lori only buys presents for the younger children so they will want to be with her. Jessica and Chelsey both stated that they wanted to stay with their dad. When eight-year-old Kensie was asked, she stated, "Both." Six-year-old Seth repeated this answer.
After reviewing the testimony presented at the dispositional hearing, we cannot say that the trial court, who was in the best position to judge credibility of all witnesses, made an imporper disposition. The court found it to be in the children's best interests to stay with their father where they had been living for the past sixteen months pursuant to a voluntary safety agreement. We note again that this is not the kind of expensive, supervised visitation imposed in some cases. As previously noted, the children are typically gathered for an outing with their mother and paternal grandmother. We also note the court's language encouraging commencement of family counseling in the near future with an eye towards unsupervised visitation. Upon our review of the record, we find no error in the trial court's determination on disposition. As such, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER SIX
Lori's sixth and final assignment of error alleges:
 "THE TRIAL COURT IMPROPERLY PERMITTED THE FATHER TO PRIVATELY PROSECUTE DHS' COMPLAINT AT THE DISPOSITIONAL HEARING ONCE THE DEPARTMENT OF HUMAN SERVICES WITHDREW."
Once again, allegations of a conspiracy between Gary and the Department are raised. The word "bizarre" is used by Lori to describe the court's decision to allow the Department to withdraw at the dispositional hearing and allow Gary and his attorney to litigate their position.
As Gary responds, Lori cites no authority for her complaints. Gary directs us to Juv.R. 29(E)(1), which states that if the allegations of the complaint are denied, the court shall "direct the prosecuting attorney or another attorney-at-law to assist the court by presenting evidence in support of the allegations of the complaint." See, also, Juv.R. 27(B)(2)(c) (mentioning the attorney of any party can submit questions for the court to ask in determining a child's competency).
As aforementioned, even where the Department files a complaint alleging abuse, neglect, or dependency, a parent may later file a motion for legal custody. R.C. 2151.353(A)(3). That parent has the right to have his motion presented by an attorney of his choosing. Juv.R. 4(A) (stating that all parties have the right to counsel and every parent has the right to court-appointed counsel if indigent). If that parent hires an attorney to present his argument concerning legal custody, there is no reason why the Department is required to remain in the dispositional hearing, expending its funds, just to back up the parent who hired his own attorney for this very purpose. See Juv.R. 29(B)(5) (which requires the court to inform unrepresented parties of their right to counsel, to offer evidence, and to cross-examine witnesses).
We should also note that when the Department's attorney read their letter asking to withdraw from the dispositional hearing, Lori offered no objection and expressly stated that she had no objections to the letter's submission, other than an evidentiary issue concerning a comment within it. Accordingly, this argument is without merit.
Lastly, concerns about juvenile proceedings acting as a substitute for domestic relations proceedings have been addressed by the Supreme Court.Riddle, 79 Ohio St.3d at 264-265 (sharing the concern but noting that the bifurcation of the hearings helps to direct the focus of the inquiry away from any parallel custody issues). In that case, the child was living with grandparents who called the children services agency. The child's father then entered into a contract with the agency in which he promised to find a home and a stable job in less than two months or the agency would assist the grandparents in obtaining legal custody. When the father was unable to find a home and job in time, the agency filed a complaint. Still, the Court held that the primary purpose of the neglect complaint was not a vehicle to obtain custody. Id. at 265. The Court distinguishedIn re Reese (1982), 4 Ohio App.3d 59, where an aunt who had possession of the child was the complainant and where the primary objective of the complainant was to obtain custody). In comparing our case to Riddle, we find Lori's argument to be without merit. See, also, In re Pryor (1993),86 Ohio App.3d 327, 335 (where the Fourth District held that there is nothing in the statutory scheme which turn a dependency action into something else merely due to the nonparticipation of the agency, even where that nonparticipation occurs at the adjudicatory phase).
As analyzed in the second assignment of error, even where a divorce is pending and issues of custody exists, the juvenile court still has jurisdiction to adjudicate a complaint alleging abuse, neglect, or dependency and enter a subsequent dispositional order granting custody to a parent. Accordingly, this assignment of error is without merit.
For the forgoing reasons, the judgment of the trial court is hereby affirmed.
Waite, J., concurs.
DeGenaro, J., dissents; see dissenting opinion.
[1] Additionally, the words health and welfare are usually embodied in a concept employed to determine whether a statute is ambiguous or overbroad. In recognizing this, we ask how the test used to determine statutory validity is itself ambiguous. See, e.g., State Med. Bd. v.Miller (1989), 44 Ohio St.3d 136. See, also, City of Rocky River v. StateEmp. Rel. Bd. (1989), 43 Ohio St.3d 1, 15-16 (noting that Article II, Section 34 of Ohio's Constitution, which uses words such as health and welfare, is "so clear and unequivocal.").