OPINION
[¶ 1] Defendant-appellant Antonio Griffin appeals from his conviction of attempted murder with a firearm specification that was entered after a jury trial in the Mahoning County Common Pleas Court. The issues before us deal with weight of the evidence regarding self-defense and the trial court's answer to a jury question posed during deliberations. For the following reasons, appellant's conviction of attempted murder with a firearm specification is affirmed.
 STATEMENT OF FACTS [¶ 2] In early 1999, appellant had been staying with Rocky DeFrank on McKinley Way in Youngstown, Ohio. Also living in the house were Tammy Hileman, who was Mr. DeFrank's girlfriend of seven years, and their two children. On May 28, 1999, appellant had planned to go out with Mr. DeFrank, Ms. Hileman, and Erin Vath. However, after a possible dispute with Ms. Vath, appellant was left at home. (Tr. 283).
[¶ 3] According to Mr. DeFrank, Ms. Hileman, and Ms. Vath, they went to a bar where Ms. Hileman told Mr. DeFrank to make appellant leave their house. Apparently, she felt he endangered their family. For instance, someone fired at the exterior of their house at one point. (Tr. 318). This caused Ms. Hileman to purchase a black Remington Viper .22 caliber rifle for protection. Appellant kept a MagTech .22 caliber rifle at the house as well. After arguing about appellant with Ms. Hileman, Mr. DeFrank agreed to tell him to leave. The three returned to the house near 2:30 a.m. Mr. DeFrank entered the house while Ms. Hileman and Ms. Vath waited in the driveway. (Tr. 289).
[¶ 4] According to Mr. DeFrank, upon entering the house he saw appellant drinking with Scott Downey who immediately left when the argument started. Mr. DeFrank testified that he noticed bullet holes in the ceiling and walls. When he confronted appellant, appellant expressed anger that Mr. DeFrank went out with the girls without him. Mr. DeFrank stated that he pushed appellant to the ground after noticing appellant grabbing a forty-ounce beer bottle sideways as if to hit him. (Tr. 290). Mr. DeFrank testified that he then exited the house, telling appellant to come outside when he could "talk like a man." (Tr. 292).
[¶ 5] Mr. DeFrank, Ms. Hileman, and Ms. Vath all testified that appellant appeared on the front porch carrying a rifle in each hand, shooting Mr. DeFrank three times. Mr. DeFrank relayed that before shooting, appellant asked something akin to: "you going to lay your fucking hands on me?" (Tr. 292). Mr. DeFrank explained that he was shot in the back first, and then the arm, and then the buttocks. (Tr. 293).
[¶ 6] Ms. Hileman called 911 almost immediately; as the first police car approached the scene, they encountered appellant three houses down walking quickly away. They stopped to see if he needed assistance, and he spontaneously announced that he had just shot someone who had been pointing a gun in his face. (Tr. 461). Appellant then pointed to the two rifles that he set in the grass.
[¶ 7] Mr. Downey testified that he came to the house to see Mr. DeFrank but found appellant instead. He noted that appellant did not seem upset, and they went to a bar to find Mr. DeFrank but did not succeed. (Tr. 495). He said that they had only been back at the house for five minutes when Mr. DeFrank returned home. He concluded by testifying that he left as soon as the two started arguing. (Tr. 498).
[¶ 8] Appellant, who was twenty years old at the time, denied that he and Ms. Vath argued and denied that he was angry that he was left at home. (Tr. 560, 561). Appellant testified that Mr. Downey, whose name he did not know, arrived shortly after Mr. DeFrank left. Appellant claimed that he did not recall leaving the house and did not believe that he went to a bar with Mr. Downey. (Tr. 563). When Mr. DeFrank arrived home, appellant heard him arguing with Ms. Hileman in the driveway. He said that Mr. DeFrank then entered the house and began yelling at him in such a drunk and slurred manner that he could not understand what Mr. DeFrank was yelling about. Appellant noted that Mr. DeFrank kicked his pit bull down the steps, which Mr. DeFrank confirmed while alleging that appellant sicked the dog on him.
[¶ 9] Appellant then stated that Mr. DeFrank smacked his forty-ounce out of his hand, punched him in the face, threatened him in some manner, grabbed both rifles from behind a speaker, and exited the house. (Tr. 572-574). Appellant testified that he followed and saw Mr. DeFrank pointing the black Remington in Ms. Hileman's face with his left hand and holding appellant's brown MagTech with his right hand. When Mr. DeFrank saw appellant, he allegedly pointed the brown MagTech at appellant's face. (Tr. 577). Appellant then related that when Mr. DeFrank turned back to look at Ms. Hileman, his grip slackened allowing appellant to grab the MagTech from Mr. DeFrank's right hand. (Tr. 579). Then, before Mr. DeFrank could swing his black Remington to shoot appellant, appellant shot him. (Tr. 581). Appellant said that after he shot him, Mr. DeFrank dropped the black gun. Appellant only recalled shooting him once. According to appellant he grabbed the other gun from where Mr. DeFrank dropped it and ran.
[¶ 10] Police testimony established that one shell casing was found in the house, two were discovered on the front porch, and one was noticed at the bottom of the porch steps in the driveway. (Tr. 449, 473). Police also noticed a bullet hole in the interior wall with a bullet fragment in it. (Tr. 477). The witnesses relayed the same story to police immediately after the shooting as they relayed on the stand. (Tr. 473-479).
[¶ 11] Besides appellant's self-defense testimony, some other evidence arguably pointed in his favor. First, Ms. Vath admitted that the story she told "on the streets" was that Mr. DeFrank had a gun, appellant shot that gun and Mr. DeFrank, and appellant took Mr. DeFrank's gun from him. She claimed that this story was false and the reasons she told it was because Mr. DeFrank did not want "to look like a punk" by not having his gun. (Tr. 441).
[¶ 12] Second, the black Remington had two holes in the plastic stock, one on each side, which appeared to be evidence of something entering at a trajectory path such as a bullet. Neither Ms. Hileman, who bought the gun a few weeks before, nor Mr. DeFrank had ever seen the hole in the stock. The state's explanation was that if it was a bullet hole, then it happened when appellant was shooting the other rifle in the house. Appellant countered that the stock proves his story is true. Defense counsel argued that Mr. DeFrank was holding the black Remington in his left hand when appellant shot him and the gun. Although appellant's first words to police minutes after the shooting both admitted he shot Mr. DeFrank and stated it was because he had a gun pointed in his face, police did not test around the hole in the stock for blood or attempt to determine if the hole was caused by a bullet.
 PROCEDURAL HISTORY [¶ 13] Appellant was indicted for attempted murder with a firearm specification in June 1999. R.C. 2903.02(A)(D); 2923.023(A)(E); 2941.145(A). He entered into a plea agreement with the state in October 1999, whereby he pled guilty to felonious assault with a firearm specification. Prior to sentencing, he filed a motion to withdraw his guilty plea, which the trial court denied. He was sentenced to four years on the felonious assault plus three years on the gun specification. In March 2001, this court reversed the denial of his motion to vacate his plea and remanded the case for further proceedings. The Supreme Court denied the state leave to appeal in August 2001.
[¶ 14] Because the plea agreement was vacated, the original charge of attempted murder was reinstated. See motion and entry April 4 and 5, 2001. The charge and gun specification were tried to a jury in August 2001. On August 7, 2001, the jury found appellant guilty of attempted murder with a firearm specification. He was thereafter sentenced to ten years for attempted murder plus three years on the firearm specification.
[¶ 15] We note that counsel filed a notice of appeal from the entry of conviction rather than the sentencing entry, and thus, the appeal was prematurely filed. However, we shall apply the notice of appeal to the later sentencing entry. This case was fully briefed in May 2002; however, we then allowed appellant supervised use of the file and transcripts in prison to determine if he wished to raise any other error. He then filed a letter with this court, the contents of which we agreed to consider during our merit review.
 ASSIGNMENT OF ERROR NUMBER ONE [¶ 16] Appellant sets forth two assignments of error on appeal, the first of which provides:
 [¶ 17] "THE APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 [¶ 18] The gist of this assignment of error is that the jury's determination that he did not act in self-defense is against the weight of the evidence. Yet, the brief also throws in language about sufficiency of the state's evidence. As we have stated numerous times, weight of the evidence and sufficiency of the evidence are distinct concepts.
[¶ 19] Whether or not the state's evidence is sufficient is a question of law dealing with adequacy of the evidence to even be presented to a jury. State v. Thompkins (1997), 78 Ohio St.3d 380, 386. In determining this question of law, we view the evidence in the light most favorable to the state and determine whether any rational fact-finder could find the essential elements proven beyond a reasonable doubt. Statev. Goff (1998), 82 Ohio St.3d 123, 138. Three witnesses testified that appellant exited the house with two rifles and shot the unarmed victim multiple times as appellant walked from the porch to the driveway. Two shell casings were found on the porch and one in the driveway. The victim had three bullet points of entry.
[¶ 20] Note that by claiming self-defense, the defendant admits the elementary facts offered by the prosecution and relies on independent facts and circumstances which he claims exempt him from liability. Statev. Martin (1986), 21 Ohio St.3d 91, 94. Specifically, appellant admitted to police and on the stand that he shot the victim. Construing the evidence in the light most favorable to the state, a reasonable person could find that the state proved the elements of attempted murder beyond a reasonable doubt. See State v. Gore (1999), 131 Ohio App.3d 197,200-201 (where we explained that if the trial revolves around two different stories about the same event, either one of which if reasonably believed, is sufficient to prove or disprove the prosecutor's case, then the issue is weight rather than sufficiency).
[¶ 21] It was appellant's burden to establish his affirmative defense by a preponderance of the evidence. R.C. 2901.05(A). The test for self-defense is as follows: (1) the defendant was not at fault in creating the violent situation; (2) the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was the use of force; and (3) the defendant did not violate any duty to retreat. State v. Thomas (1997), 77 Ohio St.3d 323,326; State v. Jackson (1986), 22 Ohio St.3d 281, 283.
[¶ 22] Appellant sets forth an argument that he introduced sufficient evidence which if believed would raise questions in the minds of reasonable persons. However, this is not an issue on appeal because the trial court here instructed the jury on self-defense as requested by the defense. Thus, we agree that appellant created a colorable claim of self-defense sufficient to warrant the instruction.
[¶ 23] Finally, appellant claims that the jury's decision (that he did not act in self-defense) is against the manifest weight of the evidence. Weight of the evidence concerns the effect of the evidence in inducing belief. Thompkins, 78 Ohio St.3d at 387. To reverse a verdict as being against the manifest weight of the evidence, the reviewing court would have to sit as the "thirteenth juror" and determine that the jury clearly lost its way and created a manifest miscarriage of justice. Id. Because credibility of the witnesses and weight of the evidence are the province of the jury, a verdict is reversed on manifest weight of the evidence grounds only in exceptional circumstances. Id.; State v. DeHass
(1967), 10 Ohio St.2d 230, 231. The jury is in the best position to observe the demeanor, gestures, and voice inflections of the witnesses who testify. Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80.
[¶ 24] We agree that a reasonable juror could believe appellant's story that Mr. DeFrank had both guns. Maybe appellant did grab a gun from Mr. DeFrank and shoot him before he could shoot back. Likewise, appellant's explanation about the hole in the stock of the black Remington and the enter and exit wounds in Mr. DeFrank's arm is rational. Additionally, it is suspect that Ms. Vath told police and testified to the jury that Mr. DeFrank had no gun and appellant had both guns as he exited the house shooting, but she told a story on the street that coincides with appellant's story that Mr. DeFrank had a gun which appellant shot.
[¶ 25] Nevertheless, it is the jury's province as fact-finder to judge the credibility of varying stories; they are entitled to believe the three state's witnesses and disbelieve the defendant even where some evidence supports the defendant's version of events. Reversing on weight of the evidence after a jury trial is so extreme that it actually requires the unanimous vote of all three appellate judges rather than a mere majority vote. Thompkins, 78 Ohio St.3d at 389, citing Section3(B)(3), Article IV of the Ohio Constitution (noting that the power of the court of appeals is limited in order "to preserve the jury's role with respect to issues surrounding the credibility of witnesses."). We, as a unanimous panel, cannot say that the conflicting evidence is so lacking in credibility that the jury clearly lost its way in believing the state's version of the evidence and disbelieving defendant's self-defense claim. As such, we refuse to sit as the thirteenth juror and determine that this jury clearly lost its way. This assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER TWO [¶ 26] Appellant's second assignment of error provides:
 [¶ 27] "THE TRIAL COURT ABUSED ITS DISCRETION IN ANSWERING A QUESTION POSED BY THE JURY RESULTING IN A DENIAL OF APPELLANT'S CONSTITUTIONAL RIGHT TO A FAIR AND IMPARTIAL TRIAL."
 [¶ 28] The pertinent part of the jury question asked, "Am I correct by saying in order for Antonio to be guilty — the prosecution must prove to me by evidence presented through testimony (aside from date and Mahoning County) that Antonio purposefully or intended in his mind when he shot Rocky that he planned to kill him or bring major harm to him." (Emphasis sic.) The communication then stated in a new paragraph, "So that — If I am not convinced of the evidence presented by prosecution, even though Antonio admitted shooting Rocky, he is not guilty."
[¶ 29] The court and the attorneys discussed how this question represented only the voice of one juror who should not be asking questions on her own without the participation of the entire jury. The court voiced its concern that the juror who wrote the question added the element of planning or prior calculation and design to the offense. (Tr. 784). The court found it significant that the word planned was underlined. (Tr. 786). The state agreed and reasoned that the jury may increase the state's burden to require them to show a plan or prior calculation and design. (Tr. 785). Contrary to the state's contention on appeal, the defense did sufficiently voice its objection to the court's answer to the first part of the jury question. (Tr. 786-788, 790). Defense counsel stated that from a lay perspective, there may be no distinction between plan and purpose and if the word plan is removed from their thought process, the element of purpose may be removed as well. (Tr. 766, 788). Defense counsel suggested that the court merely reread the definition of purpose. (Tr. 787).
[¶ 30] The court answered the first part of the jury question by advising, "this a charge called attempted murder as defined by the law of the State of Ohio, and it does not include an element of planning of any sort. In fact the charge is, simply, that on or about May 28, 1999, at Mahoning County, Ohio, Antonio Griffin did purposely engage in conduct which, if successful, would result in the crime of murder in that he did purposely attempt to cause the death of Rocky DeFrank. Again, there's no element of planning in the law of the State of Ohio on this crime." (Tr. 798).
[¶ 31] Defense counsel did not object and seemed to have no problem with the court's answer to the second part of the jury question, and thus, any argument on appeal is waived. State v. Williams (1997),51 Ohio St.2d 112, 116-117. Regardless, the second part of the question and the court's answer thereto (of which only part is evasively quoted in appellant's brief) are not actually raised as issues on appeal but are merely pointed out in an apparent attempt to argue that at least one juror seemed hesitant to convict appellant. (Tr. 798-799).
[¶ 32] Appellant's brief claims that the trial court improperly instructed the jury regarding the question posed, cites the statute for and elements of felonious assault, and makes arguments as to why the jury question properly stated the law for felonious assault. This argument is absolutely meritless and misguided. Appellant was indicted for, tried on, and convicted of attempted murder. Both parties explicitly stated that they did not desire jury instructions on any other offenses. Felonious assault was not an issue at trial and is not an issue now.
[¶ 33] Appellate counsel does not seem to raise the same specific arguments as defense counsel did when asking the court to merely reread the elements rather than mention that planning is not one of them. Appellant's handwritten pro se letter, filed with this court after his prison-supervised review of the transcripts, leads us to another issue related to the jury question issue, which was not raised below or in the appellate brief. We note that because it was not raised below, we are conducting a plain error review. In reviewing this issue, we will necessarily address trial counsel's arguments which were never explicitly re-raised on appeal.
[¶ 34] It appears that appellant himself may have discovered the reason that the jury question contained the word planned. During the original jury charge, the court instructed on the elements of murder: purposely causing the death of another. The court explained that purpose and intent mean the same thing and that a person acts purposely when it is his specific intention to cause a certain result. The court stated that purpose is a decision of the mind to do an act with a conscious objective of producing a specific result. (Tr. 755). The court then advised how purpose to cause death can be inferred from the means and manner involved. (Tr. 756).
[¶ 35] Prior to these instructions, the court generally stated that the jury must find beyond a reasonable doubt that the defendant purposely engaged in conduct which, if successful, would have resulted in the commission of the offense of murder. The court defined attempt separately by stating, "A criminal attempt is when one purposely does something which is an act constituting a substantial step in a course of conduct planned to result in his commission of a particular crime." (Tr. 754) (Emphasis added). The court then explained, "in other words, a criminal attempt is an unsuccessful try at committing a particular offense." (Tr. 754-755).
[¶ 36] Here lies the perceived conflict between the instruction on purpose (and later instruction that planned is not an element) and the instruction on attempt (where the word planned is used). Attempt is statutorily defined as purposely or knowingly, when one of these mental states is sufficient culpability for the commission of an offense, engaging in conduct that, if successful, would constitute or result in the offense. R.C. 2923.02(A). The trial court used this definition and then added the quote from page 754 containing the word planned. This added definition is not erroneous as such definition has been set forth by the Ohio Supreme Court. See, e.g., State v. Green (1991),58 Ohio St.3d 239, 240; State v. Woods (1976), 48 Ohio St.2d 127, 131
(utilizing both definitions of attempt and citing ALI's Model Penal Code Sec. 5.01). See, also, 4 Ohio Jury Instructions (1997), Section 523.02.
[¶ 37] The trial court found that the juror's use of the word "plan" could add an extra element to the definition of purpose when speaking of murder and result in the implementation of a prior calculation and design mens rea test rather than a purpose mens rea test. As such, the court reread the elements of attempted murder and instructed the jury that there is no element of planning. If planning necessarily means prior calculation and design, then it is understandable for appellant to perceive a conflict between the definitions for attempt and the definition for murder or its mental state of purposely. Under trial counsel's argument, the jury was using plan and purpose or intent synonymously. This also may have been so.
[¶ 38] However, the word plan has multiple lay meanings and may have more than one legal meaning. For instance, if there is "instantaneous deliberation," there is no prior calculation and design for aggravated murder, but there could be purpose for murder. Although the definitions of prior calculation and design all seem to use the word plan, the word is not used alone because design, a lay synonym for plan, must be accompanied by prior calculation. Thus, prior calculation and design means that purpose was reached by a definite process of reasoning in advance of the murder, which process included a mental plan involving studied consideration of the method and means of causing death. State v.Hanna, 95 Ohio St.3d 285, 2002-Ohio-2221, ¶ 39; State v. Coley
(2001), 93 Ohio St.3d 253, 266. Not only must there "have been sufficient time and opportunity for the planning" of the act, but the circumstances must also show "a scheme designed to carry out the calculated decision to cause the death." Id. (emphasis added).
[¶ 39] In conclusion, the trial court's original attempt instruction which may have helped to implant the word "planned" into some jurors' minds was not prejudicial to appellant but rather could have only helped him or added nothing at all. Even if the jurors were using planned as a synonym for the word purpose, removal of the word did not prejudice appellant as the word purpose was reinstructed and thus remained as the jury's focal point. As appellant notes, when a jury requests further instruction during deliberations, the trial court has the discretion to determine its response to that request. State v. Carter (1995),72 Ohio St.3d 545, 553. We hold that the trial court did not act unreasonably, arbitrarily, or unconscionably when it determined that use of the word planned, especially when underlined by the juror, could create in the jury's mind the belief that they must find something greater than the legal definition of purpose. As such, the court did not abuse its discretion in answering the jury question. This assignment of error is overruled.
 FINAL ISSUES [¶ 40] As noted, appellant filed a pro se letter which we previously accepted for review. We addressed appellant's jury instruction concern supra. His final concern is that his paperwork at the prison still shows that he is incarcerated for felonious assault as he had been pending his appeal of the initial plea and sentence. After the plea withdrawal and new trial, a member of the records department at the prison signed a return on the warrant to convey him to prison on the offense of attempted murder. Yet, it appears that the prison records generator is under the impression that appellant was returned to the trial court for resentencing on felonious assault rather than for a trial on the original indicted crime of attempted murder. (Appellant attached what is alleged to be a print-out from the prison showing that his offense is felonious assault, that he was resentenced, and that his new sentence is ten years plus three years; the ODRC website also lists felonious assault as his offense.) For the sake of clarity of the records, we will serve a copy of our judgment entry in this case on the prison.
[¶ 41] However, this is not the remedy appellant seeks. Rather, he argues that he is involuntarily confined due to this mistake in the records. This argument is meritless. The validity of his incarceration is determined by a conviction and sentence, not by a piece of paper from a prison that forgot to change the name of the offense after appellant was granted plea withdrawal.
[¶ 42] In case appellant misunderstands what happened down below, we would point out that contrary to what he may believe, when he is indicted for first-degree felony attempted murder, pleads to second-degree felony felonious assault, and is permitted to withdraw his plea by the appellate court, he cannot expect to be tried on the lower felonious assault charge. See R.C. 2903.11(D); 2923.02(E); 2929.14(A)(1) and (2). He was indicted for attempted murder; the state only agreed to amend the indictment to felonious assault in exchange for a plea. This is often one of the main purposes of a plea agreement and one of the chances a defendant takes when he seeks to withdraw his plea and face trial instead. When he withdrew his plea, he withdrew from the plea agreement. In fact, after our plea vacation and remand, the state even sought to ensure he understood this process by filing a motion to vacate the prior amendment and reinstate and proceed on the original indictment, which the court granted without objection. Moreover, we specifically stated, when we allowed appellant to vacate his prior plea, that the state would be restored to the position it was in prior to the plea. State v. Griffin
(Mar. 16, 2001), 7th Dist. No. 00CA17. See, also, State v. Ledford (Jan. 24, 2000), 12th Dist. No. CA99-05-014; State v. Brigham (Feb. 27, 1997), 10th Dist. Nos. 96AP07-964-970; State v. Fenton (1990), 98 Ohio App.3d 412,418 (6th Dist.).
[¶ 43] Accordingly, appellant's conviction of attempted murder with a firearm specification is hereby affirmed.
[¶ 44] For the reasons expressed in this court's opinion, the two assigned errors in the brief filed by counsel are overruled. Any further errors alleged by appellant in his pro se letter to this court are also overruled.[1] In accordance, appellant's conviction of attempted murder with a firearm specification is hereby affirmed.
Judgment affirmed.
Donofrio and DeGenaro, JJ., concur.
[1] It appears that the prison's records list appellant's offense as felonious assault rather than attempted murder. Appellant withdrew his plea to felonious assault and was then tried and convicted of the originally indicted crime of attempted murder. Hence, the prison records should be adjusted accordingly.